UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v<br><br>(1) ROBERT JEFFREY MUELLER | <u>CRIMINAL NO. SA 24 CR 563 XR</u> |

<u>GOVERNMENT'S MOTION *IN LIMINE* TO EXCLUDE EVIDENCE</u>

TO THE HONORBALE XAVIER RODRIGUEZ, UNITED STATES DISTRICT JUDGE:

Based on evidence provided to the United States by Defendant and information provided by a third-party witness, it appears to the United States that Defendant seeks to introduce at trial evidence which will be irrelevant, misleading, and confusing, any probative value of which would be outweighed by prejudice, and therefore pursuant to Federal Rule of Evidence Rules 104(a)[1], 401[2], 402[3], and 403[4] the United States moves *in limine* for its exclusion. It is within the Court's discretion to exclude evidence according to these rules. *See, e.g., United States v.*

---

[1] "In General. The court must decide any preliminary question about whether a witness is qualified, a privilege exists, or evidence is admissible. In so deciding, the court is not bound by evidence rules, except those on privilege."

[2] "Evidence is relevant if:
"(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and
"(b) the fact is of consequence in determining the action."

[3] "Relevant evidence is admissible unless any of the following provides otherwise:
- the United States Constitution;
- a federal statute;
- these rules; or
- other rules prescribed by the Supreme Court.
"Irrelevant evidence is not admissible."

[4] "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."

*McClatchy*, 249 F.3d 348, 358 (5th Cir. 2001), *cert. denied*, 534 U.S. 896 (2001) ("This Court reviews a district court's admission or exclusion of evidence for abuse of discretion.")

The evidence in question pertains to the pricing of life settlement policies. Specifically, Defendant intends to enter the price the dealer who sold the policies to Defendant[5] paid for the policies. Second, Defendant seeks to enter the price other unrelated buyers paid for policies from the same dealer. Defendant seeks to enter the prices third parties paid for the purpose of comparing Defendant's price in an attempt to justify Defendant's misrepresentations to victims.

To assist the Court, the United States will first set forth the procedural background of the case, then the factual background.

Procedural Background

Defendant was indicted on November 6, 2024, charged with eight executions of a wire fraud scheme to defraud investors and to obtain their money by means of false and fraudulent pretenses, representations and promises in violation of 18 U.S.C. § 1343[6]. Specifically, the Indictment alleged that in recruiting investors, Defendant caused them to be told that their money would be used to invest primarily in "Life Policies"; that income to the investors would come from fund revenues, including life settlement maturities and operating profits from related businesses; that the investment funds had substantial cash reserves and were debt free. The Indictment further alleges that Defendant made and caused others to make material omissions, that is, concealed the following material facts from investors, among which pertinent to this Motion were:

---

[5] For purposes of this Motion, the United States will use the word "Defendant" to refer to both the proper person Robert Jeffrey Mueller and the various entities through which he operated *e.g.* deeproot and Policy Services.
[6] The wire fraud scheme alleged in the Indictment is narrower in both scope and time than the allegations made by the Securities and Exchange Commission in its lawsuit against Defendant Mueller *et al.* in Civil Action No. SA 21 CV 785 over which the Court presided.

- that no life settlements were purchased by Defendant after May 17, 2017;
- that Defendant's companies experienced substantial cash-flow shortages;
- that on November 1, 2018, Defendant borrowed $1,080,000 from the supplier using as collateral a life settlement policy with a death benefit of $9,000,000 which had been purchased on installment from the supplier with investor funds on May 16, 2017, for $4,247,022;
- that Defendant defaulted on the payments on that note and therefore on April 8, 2019[7], Defendant had to surrender the $9 million policy back to the supplier; that a large portion of funds being invested by new investors was being used to repay earlier investors their principal and interest; and
- that new investor funds constituted the vast majority of money used to pay earlier investors.

Trial is currently set for April 13, 2026.

Factual Background

In 2014, Defendant, a licensed attorney and insurance agent, created the two investment funds at issue in the Indictment, the deeproot Growth Runs Deep Fund, LLC, (dGRD) and the deeproot 575 Fund, LLC, (575). By September 2015, Defendant began soliciting investments in the two funds. As stated above, Defendant told investors the Funds would invest in life insurance policies and in related businesses to provide relatively safe returns to investors with a set rate of return. While Defendant also represented that revenues from the related businesses would help the Funds' cash flow while waiting for policies to "mature"[8], in fact they were all

---

[7] This is the "no later than" date the United States alleges that Defendant's investment plan devolved into a wire fraud scheme.
[8] *I.e.* for the insureds to die.

3

startups generating little if any revenue beyond what one related company paid another, nearly all of which sourced back to Fund investor money.  While Defendant raised more than $58 million in total from investors in the Funds with the promise that "the majority" would be used to buy policies, he commingled the money in bank accounts only he controlled and spent less than $10 million to purchase life insurance policies for the Funds.  As stated, Defendant ceased buying new policies after May 17, 2017, despite raising approximately $43 million from new investors for the Funds after that date, using more than $820,000 of that to make Ponzi-like payments to earlier investors in the Funds.  The various offering Private Placement Memoranda (PPM) for the Funds indicated that a certain percentage of investor's funds could be used as an "advance."

In testimony to the Securities and Exchange Commission (SEC), Defendant testified that he considered the payment to earlier investors of their promised principal and interest to be allowed under this "advance" provision contained in the PPM as he considered it an "administrative expense."  As stated above, on April 8, 2019, Defendant had to surrender a $9 million policy back to the supplier.  In doing so, Defendant communicated to the supper he did not want to label the surrender of the policy a default because the PPM required him to notify investors of a default.  Defendant later stated in his SEC deposition testimony that he did not disclose the loss of that policy to the investors "because it wasn't termed a default in the agreement."

On October 7, 2020, one of Defendant's principal salesmen resigned, writing to Defendant "it has become clear that your chosen strategies and methods up to this point have been relying entirely on incoming capital from new investors to be able to honor commitments to previous investors.  While it may not be your design or intention, in functional operation it looks

4

and feels like a Ponzi scheme, and I cannot and will not be part of it." Count One of the Indictment precedes this resignation by a day; Counts Two through Eight follow it.

Discussion

With few if any factual disputes in question in this case, at least as to "what happened" as opposed to "why," the core question for a jury to determine is Defendant's intent – whether he intended to defraud. The United States submits that what the supplier of policies paid to obtain the policies prior to selling them to Defendant, the price for which the supplier bought policies it sold to any unrelated third-party, and the sales price from the supplier to any unrelated third-party should be excluded *in limine* as being irrelevant, confusing, and misleading. These issues related to the supplier will not assist the jury in determining whether Defendant's intent was fraudulent or whether he truly believed the payments of new investor money to earlier investors was both disclosed and proper under the PPM.

Under Rule 401, "relevancy" may be understood as consisting of two related aspects: materiality and probative value.

> Materiality concerns the fit between the evidence and the case. It looks to the relation between the propositions that the evidence is offered to prove and the issues in the case. If the evidence is offered to help prove a proposition that is not a matter in issue, the evidence is immaterial.

1 McCormick On Evid. § 185 (7th ed.).

> The second aspect of relevance is probative value, the tendency of evidence to establish the proposition that it is offered to prove. Federal Rule and the Uniform Rule of Evidence 401 incorporate these twin concepts of materiality and probative value. They state that "'[r]elevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." A fact that is "of consequence" is material, and evidence that affects the probability that a fact is as a party claims it to be has probative force.

*Supra* (footnote omitted). *See also United States v. Gomez*, 763 F.3d 845, 853 (7th Cir. 2014)("All evidentiary questions begin with Rule 402, which contains the general principle that '[r]elevant evidence is admissible' and '[i]rrelevant evidence is not.' Rule 401 defines relevant evidence as that which is both *probative* (having 'any tendency to make a fact more or less probable than it would be without the evidence') and *material* (the fact must be 'of consequence in determining the action')").

The prices for which the supplier purchased the policies it sold to Defendant and to any unrelated third-party, and the prices the latter paid for those policies, do not have "any tendency to make the existence of any fact that is of consequence to the determination of the action [here, Defendant's intent] more probable or less probable than it would be without the evidence." This is particularly so since all policies were purchased by Defendant well prior to the Indictment's fraud initiation date of April 8, 2019. Defendant was not aware of the price the dealer paid or the price other third-parties paid so it could not have had any impact on his mental state or intent during the conduct in the indictment.

As such, this evidence is not relevant to an issue in this case[9]. As stated above, Rule 402 provides in part that "Irrelevant evidence is not admissible."

Being irrelevant also means that it is not "probative" of any issue in the case, but assuming any probative value, the United States submits that Rule 403 also bars its admission. While baring Rule 402 "relevant" evidence is "an extraordinary remedy [that] should be used sparingly" *United States v. Watson*, 766 F.3d 1219, 1241 (10th Cir. 2014), this is clearly a case where the bar should apply.

---

[9] The standard for relevance is a low one: Does the evidence have any tendency to prove or disprove the disputed fact. *United States v. Martinez*, 938 F.2d 1078 (10th Cir. 1991).

6


As stated, the last policy Defendant purchased was on May 17, 2017. The supplier's markups[10] on policies sold to Defendant prior to that date have no bearing on what was being represented to the victim investors beyond that date and certainly not in 2020. Similarly, any markup or lack of a markup on those sold to any unrelated third-party have no bearing on the representations Defendant made to victims. This evidence would only cause confusion of the issues. Accordingly, it should be excluded.

The instant issue bears parallels to *United States v. McCallum*, 788 F.2d 1042 (5th Cir. 1985), *cert. denied*, 476 U.S. 1182, (1986). In that case, the defendant was an employee of a bond company, Allied, whose authority via his employer to write immigration bonds had been revoked. Continuing to write bonds nevertheless, defendant was prosecuted for making false statements (to wit: that he was writing valid bonds) in violation of 18 U.S.C. § 1001. At trial, "McCallum sought to introduce evidence that the Immigration and Naturalization Service had filed suit against Allied to collect on several forfeited bonds which McCallum had signed. The evidence was offered to impeach the testimony of Allied's officers, impugning their motivation for testifying that McCallum was without authority to bind their company. The district court noted that this evidence might show possible prejudice by Allied's officers, but that this possibility was 'far outweighed under Rule 403 by confusing the jury on a matter that really is not relevant.'" *Id.*, at 1044-45. The 5th Circuit affirmed noting that "[t]he admissibility of evidence for impeachment purposes is committed to the broad discretion of the trial judge. We perceive no abuse of that discretion." *Id.* The United States submits that the exclusion of the proffered evidence in *McCallum* is a closer call than the instant question related to the markup of policies sold to Defendant and to any unrelated third-party.

---

[10] A merchandising term meaning the difference between one's inventory purchase and selling prices.

Another case excluding a defendant's offered evidence in a closer call than the instant case is *United States v. Kimmel*, 777 F.2d 290 (5th Cir. 1985), *cert. denied*, 476 U.S. 1104, (1986). There, defendant Kimmel financed his purchase of a company agreeing to secure the loan with a percentage of his accounts receivable which he was to report to the lender. Kimmel was charged with mail fraud in violation of 18 U.S.C. § 1341 for mailing to the lender false reports between January and April 1980 which omitted receivable payments Kimmel had diverted to his personal bank accounts. At trial, Kimmel sought to introduce a written release the lender had provided after the fact in August 1981 "absolving Kimmel from civil legal liability. Kimmel tried to introduce this release as evidence of his good faith in withholding the funds. The trial court held the release to be irrelevant, however, and refused to allow its admission." *Id.*, at 291-292. The 5th Circuit affirmed stating "we may not second guess the trial judge's evidentiary rulings absent an obvious abuse of discretion. No abuse appears here; rather, the court's decision appears to be fully justified. Kimmel's argument founders because of its inaccurate premise that [the lender's] release is logically relevant to Kimmel's good faith diversions of the receipts. The release came eighteen months after the diversions and gives not the slightest indication of what went through Kimmel's mind as he mailed the false reports. The exclusion of the release therefore provides no basis for reversal." *Id*. Again, how much Defendant's supplier marked up the policies he sold to Defendant and any unrelated third-party "gives not the slightest indication of what went through [Defendant's] mind" as he made and caused others to make the materially false statements and omissions at issue in this case.

Finally, in *United States v. Wadi*, 153 F.4th 465 (2025), defendant was charged in a "sting" operation with violating 18 U.S.C. § 956, Conspiracy to Kill, Kidnap, Maim, or Injure Persons or Damage Property in a Foreign Country; 18 U.S.C. § 2339B, Conspiracy to Provide and Attempt

8

to Provide Material Support to Designated Foreign Terrorist Organization; and 18 U.S.C. § 2339A, Conspiracy to Provide and Attempt to Provide Material Support to Terrorists. At trial, to support an entrapment defense, defendant proffered the testimony of his son about defendant's "financial struggles" leading into and during the criminal activities. This evidence was excluded based on the trial court's ruling that the "proposed testimony was 'irrelevant' and 'more prejudicial than probative.'" *Id.*, at 472.

In rejecting Wadi's argument "that the district court's ruling violated his Sixth Amendment right to present a complete defense" the 5th Circuit stated that "We review alleged violations of that right *de novo*, subject to review for harmless error. We review rulings on admissibility of evidence for abuse of discretion." *Id.* (internal citation and quotation marks omitted.) The Court continued:

> [T]he Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense. Still, a defendant's right to present relevant evidence ... is subject to reasonable restrictions. As a result, state and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials, and [s]uch rules do not abridge an accused's right to present a defense so long as they are not arbitrary or disproportionate to the purposes they are designed to serve. Federal Rules of Evidence 401 and 403, which exclude irrelevant evidence and evidence that is more prejudicial than it is probative, serve legitimate interests in the criminal trial process. Because those rules are not arbitrary or disproportionate to the purposes they are designed to serve, they do not run afoul of the Sixth Amendment.
>
> As those rules do not violate the Sixth Amendment, we review the district court's admissibility determinations under them for abuse of discretion.

*Id.*, at 472-73 (internal citations and quotation marks omitted.)

Accordingly, the prices Defendant's supplier of life settlement policies paid for the policies it sold to Defendant and the prices for which the supplier acquired other policies and the prices for which it sold those policies to any unrelated third-party customer of the supplier

9

should be excluded *in limine*.

        Respectfully submitted,

        JUSTIN R. SIMMONS
        UNITED STATES ATTORNEY


        WILLIAM R. HARRIS
        ASSISTANT UNITED STATES ATTORNEY
        Ohio Bar No. 0017818

        ALICIA LOVETT McNAB
        ASSISTANT UNITED STATES ATTORNEY
        601 N.W Loop 410, Suite 600
        San Antonio, Texas 78216-5597
        (210) 384-7025

## CERTIFICATE OF SERVICE

I hereby certify that on the 4th day of February 2026, a true and correct copy of the foregoing instrument was electronically filed with the Clerk of the Court using the CM/ECF System which will transmit notification of such filing to the following CM/ECF participant:

H. Jay Hulings, Esquire
719 S. Flores Street
San Antonio, Texas 78204
jhulings@dslawpc.com

        WILLIAM R. HARRIS
        Assistant United States Attorney

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v<br><br>(1) ROBERT JEFFREY MUELLER | CRIMINAL NO. SA 24 CR 563 XR |

ORDER

Before the Court is the Government's Motion *In Limine* to Exclude Evidence, and for the reasons stated therein, the Court finds that it should be GRANTED.

Specifically, the Court finds that the prices that Defendant's companies' provider of life settlement policies paid for the policies it sold to Defendant's companies, and the prices it paid for the policies it sold to a third-party and the amounts for which it was paid by the third-party are not relevant to the issues in this case and are therefore inadmissible. Alternatively, the Court fins that any probative value of this evidence is outweighed by the risk of unfair prejudice, confusing the issues, misleading the jury.

IT IS THEREFORE ORDERED THAT such evidence will not be admitted into evidence in this case.

SO ORDERED this _____ day of February 2026.

XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE