IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>Plaintiff<br><br>v.<br><br>ROBERT JEFFREY MUELLER<br><br>Defendant | Case No.: 5:24-CR-00563-XR |

### DEFENDANT'S RESPONSE TO GOVERNMENT'S MOTION *IN LIMINE* TO EXCLUDE EVIDENCE

TO THE HONORABLE COURT:

Defendant Robert Jeffrey Mueller ("**Mr. Mueller**" or "**Defendant**") files this Response to Government's Motion *in Limine* to Exclude Evidence, and in support would respectfully show:

### I.   INTRODUCTION

Through its Motion *in Limine* to Exclude Evidence (the "**Motion**"), the Government asks the Court to limit the potential cross-examination of one of its potential witnesses—Thomas Andrew. As detailed below, the Motion is premature, as the scope of any cross of Andrew will necessarily turn on the contents of Andrew's testimony. Nonetheless, to the extent the Court finds it necessary to address cross-examination issues in a motion in limine, the Defendant's expected cross-examination of Andrew is well within the scope permitted by the Federal Rules of Evidence.

Yet the Government's Motion goes further than the potential testimony of one witness. The Government filed the Motion nearly two months before the Court's deadline, apparently in the hope of having the first word in the Court's consideration of the scope of evidence permitted in this case. The Motion thus purports to outline the Government's case against Mr. Mueller, including a summary of the allegedly false statements and material omissions that it attributes to

Mr. Mueller. But in doing so, the Government merely reveals the critical flaws in this prosecution, as noted below and as will be detailed further in Mr. Mueller's forthcoming motions *in limine*.

## II.    BACKGROUND

Mr. Mueller founded and managed the Deeproot family of companies, which included Policy Services, Inc., deeproot Grown Runs Deep Fund, LLC, and deeproot 575 Fund, LLC (collectively, "**Deeproot**"). Deeproot solicited investments that it used to purchase shares in life insurance policies and invest in various affiliated businesses. Before Deeproot would accept any investment, each investor was required to sign and initial a Subscription Agreement in which they represented that they had reviewed and understood the relevant Private Placement Memorandum ("**PPM**"), among other representations. The PPMs included carefully vetted language—approved by counsel—that described the Deeproot companies and the various risks associated with the investment.

In its initial years, Deeproot used most of its investment capital to purchase life insurance policies. Over time, and as disclosed in PPMs and other materials, Deeproot shifted its investment strategy to ventures designed to yield short-term cash flow, including the design, manufacture, and sale of cutting-edge pinball machines. The development of the pinball business was slowed by the pandemic but had regained momentum by early 2021, with the first pinball machines scheduled to ship in August of 2021 and expected to yield millions of dollars of revenues annually. But the intervention of the Government—in the form of a civil complaint filed by the SEC—forced Deeproot into bankruptcy on the eve of the completion of the first pinball machines. As a result, various investors scooped up Deeproot's valuable pinball and insurance assets for pennies on the dollar, to the detriment of Deeproot's investors. This indictment eventually followed.

The Government alleges that Mr. Mueller made various false statements to and concealed material information from eight investors identified in the indictment. The alleged false statements include purported representations that a majority of investor money would be used to invest in life insurance policies, that income to the investors would come from fund revenues, and that Deeproot had substantial cash reserves and was debt free. *See* ECF No. 1; ECF No. 32 at 2. The Government also alleges that Mr. Mueller made and caused others to make material omissions, including that Deeproot had substantial cash flow problems, that new investor funds were being used to repay previous investors, and (most relevant for this Motion), that Deeproot borrowed approximately $1 million from the seller of an insurance policy it was buying in installments. *See* ECF No. 1; ECF No. 32 at 3.

The Motion's background section—like the Indictment itself—fundamentally mischaracterizes the evidence. It selectively quotes from witness testimony, omits critical and exculpatory facts, and largely ignores the evidence regarding what Mr. Mueller actually said and to whom. For example, the Motion and Indictment allege that Mr. Mueller made or caused some unidentified third parties to make false representations to investors. But, at least as to the eight investors identified in the Indictment, this assertion is entirely without evidentiary support. Most of the investors identified in the indictment told federal agents that they never spoke with Mr. Mueller. The two who did speak with Mr. Mueller did so only briefly. The investors' only other pre-investment contact with Deeproot was brief video calls with Deeproot sales representatives, who reviewed a pre-approved PowerPoint presentation.

The investors claim that they dealt primarily with "finders," independent investment advisers who received a fee for introducing investors to Deeproot. These finders themselves had minimal (often no) contact with Mr. Mueller and limited contact with Deeproot sales

3

representatives. Moreover, each finder signed contracts stating they had no responsibility for explaining Deeproot investments, other than to deliver pre-approved marketing materials and PPMs. There is no evidence that Mr. Mueller directed, had control over, or even had knowledge of what these finders told investors—other than through Deeproot's agreements with finders and the PPMs and marketing materials provided to those finders. Thus, the only statements that the Government can fairly attribute to Mr. Mueller—and the only statements that should be admissible in evidence—are the PPMs and marketing materials approved by Mr. Mueller. Those documents do not include any of the false statements identified by the Government and, in several instances, disclose the information the Government claims was omitted.

The Motion's simplistic and misleading summary of the evidence suggests the Government hopes to float above the messy complexity of the financial transactions at issue in this case. As will be detailed in Defendant's upcoming motions, the Government is not entitled to take such short cuts. It may not allege the Defendant made statements that the Government knows he did not make. It may not ignore the dense, technical, and frequently nuanced documents that governed investments in Deeproot. It may not use misleading, inflammatory, and factually inapposite terms like "ponzi" or "ponzi-like" to appeal to a jury's prejudice. It may not ask the jury to hold Mr. Mueller accountable for the failure of his business. And it may not indulge in appeals to sympathy, even for investors who lost their savings.

### III. THE SCOPE OF POTENTIAL CROSS OF THOMAS ANDREW

The Government's simplistic approach to this prosecution is evident in its attempt to limit the introduction of evidence relating to Thomas Andrew, who sold Deeproot nearly all of its insurance policies. Deeproot failed to complete the purchase of one of those policies—the so-

called "Basha" policy—which the Government alleges should have been disclosed to potential investors.

The Motion appears to be based on a misunderstood retelling of conversations between Defendant's counsel and Andrew's counsel concerning the availability of documents reflecting the amounts Andrew paid for the policies sold to Deeproot and to Mr. Mueller's former business partner, Russ Hagan. The purpose of these discussions was to identify evidence for a potential cross-examination of Andrew, should he testify.[1] Contrary to the representations in the Motion, Defendant has no intention of introducing any such evidence in his case-in-chief, except as necessary to rebut Andrew's testimony.

The evidence demonstrates that Andrew took advantage of Mr. Mueller. Andrew had far more experience than Mr. Mueller in the esoteric business of buying and selling interests in insurance policies. Andrew leveraged that expertise to position himself as a sort of mentor to Mr. Mueller, giving Mr. Mueller advice on how to structure Deeproot, value insurance policies, and market those policies to investors. *See, e.g.*, Ex. A at 89:17-91:4 (excerpts from SEC deposition of Andrew);[2] Ex. B (SEC Ex. 13); Ex. C (SEC Ex. 14).[3] He also helped coach Deeproot sales

---

[1] In the end, Andrew's counsel provided no information that was not already included within the evidence produced by the Government, which includes hundreds of Andrew's emails and his deposition with the SEC.

[2] The SEC produced transcripts of the depositions conducted during its investigations only through text files, which yields the difficult to review format included in Exhibit A. The attached excerpts include added highlights to make clear the sections cited herein.

[3] Multiple additional emails and other documents produced by both the SEC and the Government reflect advice provided by Andrew to Mr. Mueller regarding the purchase and sale of insurance policies. If helpful to the Court, Defendant is prepared to assemble and provide those documents for the Court's review.

representatives how to identify potential investors and answer questions regarding the policies. *See* Ex. D (SEC Ex. 16) (names of potential investors redacted); Ex. E (email produced in discovery).

But Andrew was, in fact, running a long con. He saw Mr. Mueller as an easy mark. He vastly overpriced the policies he sold to Deeproot, in some cases selling the policies for 22,000% more than he paid for them. *See* Ex. A at 63:5-64:2, 69:23-70:14; Ex. F (SEC Ex. 12). He did so while purporting to coach Mr. Mueller as to the proper way to value policies, while pricing the policies he sold Deeproot at whatever amount Deeproot had available at the time. *See* Ex. A at 77:14-21, 78:7-22; Ex. C. Andrew was even pushing Deeproot sales personnel to bring in more investments, which could be siphoned away to Andrew through the overpriced policies sold to Deeproot. *See* Ex. A at 112:20-113:20; Ex. D; Ex. E. Andrew did not take similar advantage of Mr. Hagan, who had more experience in the field than Mr. Mueller.

Andrew's scheme to defraud Mr. Mueller culminated with the sale of the Basha policy, which Andrew purchased for approximately $842,000 but sold to Deeproot for over $4 million. *See* Ex. F. Andrew was well aware of Deeproot's cash flow difficulties and knew that Deeproot would have trouble making the payments on Basha policy. *See* Ex. A at 80:14-81:4. Yet Andrew convinced Mr. Mueller that paying approximately $4 million for the policy was a good deal and suggested that Deeproot make payments in installments. *See* Ex. A at 81:14-82:22. After Deeproot had paid approximately $3.2 million on the Basha policy, it had trouble making the final payment. *See* Ex. A at 84:20-85:11. In an attempt to appeal to Mr. Mueller's "human side," Andrew brazenly lied to Mr. Mueller, falsely claiming that Andrew took out a loan on his house to purchase the policy and that his house would be foreclosed on if Deeproot did not make the final payment or return ownership of the Basha policy to Andrew. *See* Ex. A at 146:8-147:1-4; Ex. G (SEC Ex. 21). Based on these false statements, Mr. Mueller agreed to permit Andrew to reclaim ownership of the

policy, sell it to a third party, keep what Deeproot owed, and return the difference to Deeproot. *See* Ex. A at 86:22-87:7. Andrew did not reveal to Mr. Mueller what he paid for the Basha policy or the actual fair market value of policy, information that was plainly material to the transaction proposed to Mr. Mueller. The resulting sale of the Basha policy yielded only $800,000, resulting a substantial gain for Andrew and a loss for Deeproot. *See Id.*

If Andrew testifies at trial, the above evidence could be admissible in a variety of ways, depending on Andrew's testimony and the Government's characterization of the evidence.

First, if Andrew testifies that he treated Deeproot fairly, sold policies at a reasonable markup, or portrays himself as an honest broker engaging in good-faith, arms-length transactions with Deeproot, evidence of his prior, contrary statements in testimony, emails, and other evidence could be admissible as prior inconsistent statements. *See* Fed. R. Evid. 613. Depending on Andrew's testimony, evidence of the extent to which Andrew overcharged Deeproot could also be admissible as a prior inconsistent statement, as potentially conflicting statements are included in prior testimony and emails. *See, e.g.*, Ex. A at 69:23-70:11; Ex. E. Similarly, if Andrew denies lying to Mr. Mueller, his prior testimony admitting that he did, in fact, "lie" to Mr. Mueller in order to convince Mr. Mueller to return the Basha policy would be admissible as a prior inconsistent statement. Ex. A at 146:8-147:1-4; *see also* Ex. G.

Second, the Defendant could ask Andrew about his years-long scheme to defraud Mr. Mueller as a specific instance (or instances) of conduct that is probative of Andrew's character for truthfulness. *See* Fed. R. Evid. 608(b). Evidence that Andrew manipulated Mr. Mueller into paying many times more for policies than they were worth and then lied to guilt Mr. Mueller into a transaction that Andrew knew would be harmful to Deeproot is certainly probative of dishonest

7

character.[4] Defendant could not introduce extrinsic evidence of this character evidence (unless admissible for some other purpose), but counsel would be free to press Andrew on this and other acts of dishonesty. *See id.*

Third, the Defendant could use evidence of Andrew's scheme to defraud Deeproot to attack Andrew's motive for testifying against Mr. Mueller. Andrew's various deceptions—and his false statement to Mr. Mueller about the purported foreclose of his home, which was conveyed through telephone calls and emails that crossed state lines—constitute a far more obvious example of wire fraud than the convoluted scheme alleged against Mr. Mueller. Andrew even effectively confessed to committing wire fraud in his SEC deposition, though only after the SEC confronted Andrew with documentary evidence of his lie. *See* Ex. A at 146:8-147:1-4; Ex. E. And yet the Government did not charge Andrew for this felony, despite his confession occurring during the applicable statute of limitations. Andrew thus has every reason to curry favor with the SEC and with the Government in this case, including by testifying in a way that helps the Government, whether that testimony is true or not. Cross-examination regarding an accusation of wrongdoing in the transaction at issue in this case is plainly relevant to show Andrew's bias and/or motive for testifying. *See United States v. Barnes*, 803 F.3d 209, 218-219 (5th Cir. 2015) ("[A]n arrest or accusation that arises out of the transaction at issue is admissible to show the possible bias of the witness."); *United States v. Landerman*, 109 F.3d 1053, 1062-63 (5th Cir. 1997) (holding that court's grant of motion in limine preventing cross-examination regarding pending charges violated the Confrontation Clause).

---

[4] Notably, the Motion does not appear to seek the exclusion of Andrew's under-oath confession that he lied to Mr. Mueller, only the supporting evidence that would put those lies into context.

Fourth, the Government appears likely to focus on the circumstances surrounding the purchase and eventual return of the Basha policy. It has already noted the details of the transaction in both the Indictment and the Motion, emphasizing the amounts of the loan, the loss suffered by Deeproot, and the negotiations between Andrew and Mr. Mueller—details that are arguably not necessary to show that Deeproot suffered a loss on the Basha policy. The implication—whether intended or not—of the Government's emphasis on these facts is that Mr. Mueller was reckless or negligent in the Basha transaction and thus may have been reckless or negligent with his representations to investors. That impression would be incomplete and misleading without full context behind the purchase of the Basha policy, including that Mr. Mueller relied on a trusted mentor to quote a fair price for the policy but was deceived by Andrew's manipulation and lies. If the Government is permitted to introduce evidence of the amount of the Basha transaction or Mr. Mueller's back-and-forth with Andrew, introduction of the above evidence would provide crucial context for those discussions, help counter any unfair inferences from the Government's presentation of the evidence, and prevent any jury confusion. *See* Fed. R. Evid. 403.

Finally, the Government's concerns about the above evidence distracting the jury or confusing the issues is not warranted. As noted above, the Defendant intends to introduce this evidence during Andrew's cross-examination, which necessarily would be limited by the scope of Andrew's direct testimony. It would also be subject to the Court's discretion as to time, scope, and manner of questioning permitted. Under these circumstances, there is little chance that the cross-examination focused on Andrew's false statements and plan to deceive the Defendant would divert the jury into extraneous issues.

The cases cited by the Government are thus distinguishable for several reasons. The defendant in *United States v. McCallum*, 788 F.2d 1042, 1044-45 (5th Cir. 1985), sought to

introduce evidence of a civil litigation brought by the witness to challenge their motive for testifying, which the Court excluded on Rule 403 grounds. The case did not concern admitted false statements, evidence of potential prior inconsistent statements, instances of bad character, and the Government's intended reliance on the details of a transaction with a testifying witness, which are all at issue here. *See id.*

Similarly in *U.S. v. Kimmel*, 777 F.2d 290, 291-92 (5th Cir. 1985), the defendant sought to introduce evidence of a release of civil liability from the allegedly defrauded lender issued some 18 months after the alleged false statements. *Kimmel* says nothing about impeachment of a testifying witness, let alone a witness who intentionally and successfully defrauded the Defendant on the very subject matter of the witness' testimony. The Government's reliance on *Kimmel* for the proposition that the amount Andrew marked-up the policies he sold to Deeproot does not provide evidence of Defendant's state of mind is entirely beside the point. Defendant does not intend to use evidence of Andrew's fraud as evidence of Defendant's state of mind, but to impeach Andrew's testimony and rebut any suggestion from the Government that Mr. Mueller was reckless.

Finally, *United States v. Wadi*, 153 F.4th 465, 472 (5th Cir. 2025), is a terrorism case in which the defendant proffered testimony of the defendant's financial struggles and claimed that the Court's exclusion of the evidence violated his Sixth Amendment rights. It is entirely irrelevant to the issues presented here, in which Mr. Mueller seeks the ability to cross-examine a witness on prior inconsistent statements, admitted lies, and other acts of fraud. To the extent that the Government relies on *Wadi* to argue that Rules 401 and 403 apply to evidence introduced by a criminal defendant, the point is not disputed and does not require exclusion of the cross-examination sought by Defendant.

## IV. CONCLUSION

For the reasons stated above, Defendant respectfully requests that the Court deny the Government's Motion.

DATED: March 3, 2026.

Respectfully submitted,

**DAVIS & SANTOS, PLLC**

By: */s/ H. Jay Hulings*
Jason M. Davis
State Bar No. 00793592
Email: jdavis@dslawpc.com
H. Jay Hulings
State Bar No. 24104573
E-mail: jhulings@dslawpc.com
719 S. Flores Street
San Antonio, Texas 78204
Tel: (210) 853-5882
Fax: (210) 200-8395

***Attorneys for Defendant***
***Robert Jeffrey Mueller***

## CERTIFICATE OF SERVICE

I certify that on March 3, 2026, the foregoing document was electronically filed with the Clerk of the Court using the CM/ECF system and all counsel of record will receive an electronic copy via the Court's CM/ECF system.

*/s/ H. Jay Hulings*
H. Jay Hulings