# Exhibit A

```
0001
 1   THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION
 2
 3   In the Matter of:         )
 4                             )  File No. HO-14036-A
 5   DEEPROOT 575 FUND, LLC    )
 6
 7   WITNESS:  Thomas N. Andrew
 8   PAGES:    1 through 154
 9   PLACE:    Securities and Exchange Commission
10             100 F Street NE
11             Washington, D.C.
12   DATE:     Thursday, May 27, 2021
13
14        The above-entitled matter came on for hearing,
15   via WebEx, pursuant to notice, at 10:02 a.m.
16
17
18
19
20
21
22
23
24            Diversified Reporting Services, Inc.
25                     (202)467-9200
0002
 1   APPEARANCES:
 2
 3   On behalf of the Securities and Exchange Commission:
 4       ERIC BERELOVICH, ESQ
 5       GEORGE BAGNALL, ESQ
 6       CHRISTIAN SCHULTZ, ESQ
 7       PAUL BOHR
 8       SACHIN VERMA
 9       Counsel, Division of Enforcement
10       U.S. Securities and Exchange Commission
11       202-551-7799
12       bereloviche@sec.gov
13
14
15   On behalf of the Witness:
16       SCARLETT COLLINGS, ESQ
17       Locke Lord LLP
18       600 Travis Suite 2800
19       Houston, TX 77002
20       713-226-1338
21       scarlett.collings@lockelord.com
22
23
24
25
0003
 1              C O N T E N T S
 2
```

```
 9              MS. COLLINGS:  I think that's just a
10   one-page document, Eric.  Do you want us to just get the
11   paper copy?
12              MR. BERELOVICH:  Let me try -- there's
13   another way that I can display this.
14              MS. COLLINGS:  Okay.
15              MR. BERELOVICH:  Just give me one second.
16              MR. BAGNELL:  This is George Bagnell.
17   Scarlet, the reason that we don't want to pull the paper
18   copies is that we want to avoid a situation where the
19   marked exhibit is not the specific document that the
20   witness is looking at.  So we really, really prefer to
21   focus only on the electronic version even though you may
22   have paper copies available.
23              MS. COLLINGS:  Understood.
24              MR. BERELOVICH:  Are you all able to see
25   Exhibit 12 now?
0063
 1              THE WITNESS:  Yes.
 2              MR. BERELOVICH:  I'm displaying on your
 3   screen a document that was previously marked as Exhibit
 4   12.
 5              (SEC Exhibit No. 12 was marked for
 6              identification.)
 7        Q     Exhibit 12 is a one-page document bearing
 8   Bates CYCL000001.  Mr. Andrew, do you recognize the
 9   spreadsheet in Exhibit 12?
10        A     Yes, I do.
11        Q     You created the spreadsheet in Exhibit 12.
12   Right?
13        A     Yes, I did.
14        Q     Describe what Exhibit 12 is.  And if you
15   need me to zoom in, let me know.
16        A     We're trying to zoom on this side.
17        Q     Unfortunately for this view, you're not
18   able to, but I will do my best if you just --
19              MS. COLLINGS:  It's --
20        A     No, I think we've got it.
21              MS. COLLINGS:  I have it.  I just need to
22   get it square.  You're okay.
23              MR. BERELOVICH:  Okay.  Got it.
24        A     So this is a list of the policies that were
25   sold to Policy Services by Cycladic LLC.
0064
 1        Q     For what time period?
 2        A     From 2015 onward.
 3        Q     And how many policies are listed here?
 4        A     Nine, I believe.
 5        Q     How many policies total did you and your
 6   entities sell to Mr. Mueller and his entities in any
 7   time period?
 8        A     Yeah, you've asked me that before.  I'm
 9   concerned that I don't have the -- an accurate answer to
10   that.  More than the policies that are displayed here.
11        Q     Was it less than 30?
```

```
18    important how much I made as long as I fulfilled his
19    parameters.
20        Q    So looking at the Herbert Smith policy,
21    Robert and Policy Services paid $872,000 for that policy
22    and would receive $1.54 million after Herbert Smith
23    passed away provided they had made the premium payments
24    and otherwise kept the policy in force.  Is that fair?
25        A    Yes.
0069
 1        Q    So the profit that they would earn from
 2    that would be contingent on how long Mr. Smith lived and
 3    what the premium payments and any other attending costs
 4    would be.  Correct?
 5        A    Correct.
 6        Q    So on this policy, you made the profit of
 7    roughly $840,000.  Correct?
 8        A    Yes.
 9        Q    Is that money that you kept entirely to
10    yourself or used to pay your employees?
11        A    I'm not sure if I understand the question.
12        Q    Did any amount of that -- strike this.
13    These sales took place through Cycladic.  Correct?
14        A    That's correct.
15        Q    Was any of the money received by Cycladic
16    in any way provided or transferred to Robert Mueller,
17    Policy Services, or any of his entities?
18        A    Absolutely not.
19        Q    So the $840,000 of profit in this instance
20    would be one -- would be, say, in essence entirely yours
21    and your company's?
22        A    Yes.
23        Q    Was any of the profit on that policy and
24    any of the ones -- let me strike that.  What I just
25    asked you about this particular policy, that holds true
0070
 1    as to all of these nine policies?
 2        A    Yes, for sure.
 3        Q    So it looks like you acquired the nine
 4    policies for a little over $1.2 million.  Correct?
 5        A    Yes, that's correct.
 6        Q    And you sold them to Mr. Mueller and Policy
 7    Services for over $8.6 million.  Correct?
 8        A    Yes.
 9        Q    So that's a profit of $7.4 million.
10    Correct?
11        A    Yes.
12        Q    And through your entities or yourself, you
13    claimed that profit for tax purposes.  Correct?
14        A    Yes, of course.
15        Q    Was any portion of that money transferred
16    directly or indirectly to Mr. Mueller or any of his
17    entities?
18        A    Absolutely not.
19        Q    Was any of it reinvested or invested by you
20    with Mr. Mueller or the funds that we've been talking
```

```
 4   here, the Richard Latshaw policy.  It appears you
 5   acquired it on November 23, 2016, and sold it to Policy
 6   Services on March 29, 2017.  Four months later.  Would
 7   that suggest it's one that you had in inventory or one
 8   that you acquired at request?
 9        A    I really don't know.  I suppose if there's
10   a policy that I purchased, settled, and sold it
11   immediately to Policy Services, it would suggest that
12   that was a policy that was requested by Policy Services.
13   But if I was sitting on it for months, I don't know.
14        Q    Would it be fair to say you charged the
15   maximum price you could that would fit within the
16   requested ROI that was provided to you by Policy
17   Services?
18        A    It wasn't a matter of charging the maximum
19   price.  That was the money that was available.  And we
20   had to fit it in that price.  There was no disclosure or
21   transparency with regard to what Cycladic paid for it.
22        Q    But when you say that was the price that
23   was available, what do you mean by that?
24        A    That was the buying power.  So, if we go
25   back to that original example of 666,666.66, that was
0078
 1   the price that was available to calculate the purchase,
 2   the closing costs, Policy Services, premium obligation
 3   and Cycladic's profit.  There were no questions ever
 4   asked of what Cycladic was paying for the policies.
 5   Here's the money.  This is what's available.  Bill it.
 6   Fill the order.
 7        Q    Well, help me understand that.  So, you're
 8   saying that, for example, the Herbert Smith policy,
 9   Robert Mueller came to you and said I had $872,000, find
10   me a policy.
11        A    He probably said, I have money to buy a
12   policy.  I don't know if it applied to Herbert Smith or
13   not, specifically.  But he would say, I have money to
14   buy a policy.  These are the parameters.  Fill the
15   orders.
16        Q    So for the Margaret Basha policy, where you
17   purchased a $9 million face policy for $842,000 and
18   change and sold it for four point, roughly, 2 5 million.
19   Is that a scenario where Mr. Mueller came to you and
20   said I have four point some million dollars to spend?
21   Or how does that --
22        A    Yes.
23        Q    Process unfold?
24        A    In that policy in particular, he requested.
25   He said, I have X dollars to spend.  I don't recall what
0079
 1   the amount was.  I showed him the policy.  He said, I
 2   want that policy.  Never asking what I was paying for
 3   it.  Never concerned.  In fact, said I don't care what
 4   you make, just fill the orders.  Within those
 5   parameters.
 6        Q    Is that the same with respect to the Benito
```

```
 7   Fernandez policy?
 8        A    I don't know if he requested that one
 9   specifically or not.  But the instructions were the
10   same.  Fill the orders within those parameters.  And
11   what you make is your business.
12        Q    On the Basha one, is that -- did he pay the
13   full amount up front at the time you acquired that
14   policy for him?
15        A    He did not.
16        Q    Well, I guess I'm confused.  If he -- you
17   said he came to you and said he had money to spend, but
18   then he didn't give you the money.  Can you help
19   reconcile that?
20        A    Sure.  I was confused too.  I went out and
21   spent $842,000 on a policy that he wanted and when it
22   came time for him to buy it, he suddenly didn't have the
23   funds available.  After he had contracted to buy it.
24        Q    So, did you have contractual agreements as
25   to each of these policies with Policy Services?
0080
 1        A    Yes.  One-off agreements for each policy.
 2        Q    And those were all written?
 3        A    Yes, they were.
 4        Q    The Margaret Basha policy, did that -- did
 5   you contract for that, to the best of your recollection,
 6   around the time you purchased it?
 7        A    That policy, I clearly remember contracting
 8   for that policy.
 9        Q    When you said you showed him that policy,
10   were you showing him one that was available for you to
11   go out and acquire or one that you had already acquired?
12        A    In the case of Margaret Basha, it was one
13   that I could go out and acquire.
14        Q    When Mr. Mueller didn't pay you right away,
15   did he give you any explanation for why he wasn't paying
16   you at that time?
17        A    He did not.  He simply told me that he was
18   short.
19        Q    Did he say how much he was short?
20        A    Well, I knew how much he was short.  I
21   don't recall the exact amount.  It may -- I don't recall
22   the exact amount that he initially paid.  But he was
23   significantly short.
24        Q    Can you just give us like a sense of what's
25   significantly?  He only had half?  He had --
0081
 1        A    He had a quarter of it.  He may have paid,
 2   again, I don't know how accurate it is.  It's a little
 3   bit foggy.  He may have paid $1 million up front.  Maybe
 4   less.  I'm not sure.
 5        Q    Did you convey the policy to him at the
 6   time he made that partial payment?  Or did you wait
 7   until you got all the money?
 8        A    I did not convey the policy to him
 9   initially.
```

```
10        Q    Did you wait until you got all of the
11   money?  Or was --
12        A    I did not wait until I received all of the
13   money.
14        Q    Do you recall how much you had been paid by
15   the -- at the time you transferred it to him?
16        A    No.  I don't recall the exact amount.  But
17   it was more than likely a year after we went to
18   contract.  Plus or minus.  He had a remaining balance.
19   He promised me that he was going to be paying
20   imminently.  I believed him.  I transferred the policy
21   to Policy Services.  I believe that was the purchasing
22   entity.  And he didn't fulfill his promise of paying me
23   imminently.
24        Q    But at the end of the day, he did
25   ultimately pay you the full sale price that's reflected
0082
 1   on this exhibit?
 2        A    No.  He did not.
 3        Q    Do you recall how much he did pay you in
 4   total on at least the Basha policy?
 5        A    He was approximately $800,000 short of the
 6   contracted $4.2 million price.
 7        Q    So, he paid around 3.4 million?
 8        A    Plus or minus.
 9        Q    What did you do about the underpayment, if
10   anything?
11        A    After I transferred the policy to him, and
12   I don't remember how long after, but after the policy
13   was transferred into Policy Service's name, and he broke
14   his promise to pay me, I presented him with a voluntary
15   relinquishment agreement that had a maturity date that
16   if at some point in the future the policy wasn't paid in
17   full, that he would permit Cycladic to voluntarily
18   relinquish the policy.  Sell the policy in the
19   marketplace in an effort to capture the outstanding
20   balance that Policy Services owed according to the
21   contract and anything in excess of that would be paid to
22   him or his company.
23        Q    What was the time frame that you provided
24   for in that relinquishment agreement?
25        A    I don't remember.
0083
 1        Q    I mean, ballpark, was it within five years
 2   or two years?
 3        A    No.  Definitely no.  Less than five years.
 4   Less than a year.  Probably less than a year.  But
 5   again, I'm not 100 percent certain.
 6        Q    And, I'm sorry, I just might be hearing it.
 7   I -- it sounds like is your counsel giving you some
 8   advice or --
 9             MS. COLLINGS:  No.  I just wanted him to
10   make one thing clear on the time period.  Like what time
11   period are you referring to Because that's getting --
12   I'm losing the thread.  And I'm not sure if he has the
```

```
13   thread.
14        Q    Well, we're talking about the Margaret
15   Basha policy, which was purchased in April of 2017 and
16   it says sold on -- in May of 2017.  So, he's now saying
17   that there was some relinquishment agreement that was
18   reached and sounded within a period of time after May
19   16, 2017.  So --
20        A    Okay.  Let me help you understand that a
21   little bit better.  He signed the agreement on -- let's
22   see.  May 16th.  He made an initial payment after he
23   signed the agreement that was significantly less than
24   the contracted amount.  My recollection is this -- these
25   broken promises and drip feeding of payments went on for
0084
 1   a year or more.  And I was concerned after titling the
 2   policy, agreeing to change the title of the policy, and
 3   him not fulfilling his promises, that he may never pay
 4   the balance.  And so, I presented him with a voluntary
 5   relinquishment agreement that he agreed to and signed.
 6   In the event that at some point in the future he didn't
 7   satisfy the outstanding balance, that he would
 8   voluntarily relinquish the policy.  Permit Cycladic to
 9   sell it in the marketplace in an effort to recapture the
10   outstanding balance.  And if Cycladic received more than
11   what it was owed, according to the contract, it would
12   pay that additional amount back to Policy Services.
13        Q    So, the drip payments went on for, I think
14   you said, about a year after May 2017.  Is that correct?
15        A    Yes.
16        Q    And it was at that point, about a year
17   afterwards, that you presented him with the
18   relinquishment agreement.  Is that correct?
19        A    Plus or minus.  Yes.
20        Q    And at the time you presented him with the
21   relinquishment agreement, he had only paid 3.4-ish
22   million of the 4.25 million sale price.  Roughly.
23        A    I don't want to be pinned down to that
24   exactly.  He may have made a payment after the
25   relinquishment agreement.  But in the end, he was short
0085
 1   the 800,000.  Approximately.
 2        Q    And you said the relinquishment agreement
 3   would have a short time period for him to make up the
 4   difference before you'd invoke the relinquishment
 5   agreement.  Is that correct?
 6        A    I don't remember the time period.
 7        Q    But I thought you said it was not more than
 8   a year.
 9        A    It was definitely less than a year.  But we
10   were already plus or minus a year into it.  Into the
11   drip payments.
12        Q    So, if you presented him the relinquishment
13   agreement a year, give or take, after May 2017, that
14   would have been around May, June of 2018.  Yes?
15        A    Yeah.  I don't know the exact date.  If you
```

```
16   have a document to that effect, I can look at it.  But I
17   don't know the exact date.
18        Q    I'm not asking for the exact date.  I'm
19   saying ballpark.  You said, about a year.  So, that
20   would put it sometime middle of 2018.
21        A    Yes.  Potentially.  And it could have been
22   11 months.  It could have been 14 months.  But let's
23   just say, generally, about a year.  It wasn't five
24   years.  It wasn't one month.  It was plus or minus a
25   year.
0086
 1        Q    And I'm just trying to establish the time
 2   period that you presented him with the relinquishment
 3   agreement.  And that would have been 11 months to 14
 4   months, we'll say, with what you just testified to,
 5   after the date of sale.  Fair?
 6        A    Fair enough.
 7        Q    So that would be at the outset, September
 8   of 2018.  Fair?
 9        A    It's possible.  Sure.
10        Q    And then you said the relinquishment
11   agreement would have had a one-year period to make up
12   the rest or you would get the policy relinquished and
13   then you could go sell it into the market.  Is that
14   fair?
15        A    No.  No.  I didn't say that it had a
16   one-year period.  I'm not sure how long the period was
17   for the relinquishment agreement.  But when you were
18   asking me, was it less than five years, definitely.  It
19   was less than five years.  I don't remember the time
20   period that he had to fulfill or satisfy the outstanding
21   balance.
22        Q    At any point in time, have you asked Mr.
23   Mueller to relinquish that policy to you, so you could
24   sell it into the market as you explained?
25        A    Yes.  When the date on the relinquishment
0087
 1   agreement came and went, I asked him to relinquish the
 2   policy.
 3        Q    And did you sell it into the market?
 4        A    I did.
 5        Q    How much do you recall, were you able to
 6   sell it for?
 7        A    Approximately 800,000.
 8        Q    Do you know to whom you sold it?
 9        A    I don't know the end buyer.
10        Q    Did you sell it to an intermediary?  Like
11   through --
12        A    It was sold through a provider.
13        Q    Which provider?
14        A    I'm thinking about that.  I'm not sure.
15        Q    Would it have been one of Mr. Hagan's
16   companies?
17        A    No, no, no.  No.  when I say a policy
18   provider, I'm talking about a licensed and regulated
```

```
0111
 1  was an accurate representation.  I don't know what the
 2  proper accurate representation is of a policy, how to
 3  value it except what it would sell for in the
 4  marketplace on any given day.
 5       Q    So the fair market value would be a more
 6  accurate representation than the face value?
 7       A    I -- if fair market value is what the
 8  highest bidder will pay for it, that's the only way I
 9  know how to value a policy.  I don't know if that would
10  be the most accurate way to value them or most fair way,
11  but that's the only way that I know the value of a
12  policy is, is what someone's willing to pay for it.
13       Q    Going to bring up another document.  Can
14  you see Exhibit 16?
15       A    Yes, I can.
16       Q    So I'm displaying a document that was
17  previously marked as Exhibit 16.
18            (SEC Exhibit No. 16 was marked for
19            identification.)
20       Q    It is a five-page document with the first
21  two pages bearing Bates CYCL004557 through 58.  And it
22  consists of a one-page cover e-mail, a one-page slip
23  sheet indicating the attachment was produced natively,
24  and a three-page PDF printout of tab 2 of the native
25  Excel.  The cover e-mail is from
0112
 1  scott@deeprootadvisors.com, and it's to Thomas Andrew
 2  copying Nathan Spradlin.  The subject is FMG and agent
 3  spreadsheet, and the attachment is titled, new leads and
 4  agents for tom.xlsx.  Mr. Andrew, let me know if you had
 5  a chance to scroll through this.
 6       A    Yes.  I've seen it.
 7       Q    What is Exhibit 16?
 8            THE WITNESS:  Can you put it back up for
 9  me?
10            MR. BERELOVICH:  Do you see it now?
11            THE WITNESS:  No, I don't.
12            MR. BERELOVICH:  Second.  Try it again.  Do
13  you see it now?
14            THE WITNESS:  No, I don't.  Maybe it's down
15  below.  Let me scroll down.  Now I see it but it's
16  rotated.  Is it possible to rotate it clockwise?
17            MR. BERELOVICH:  Yeah.  One second.  Can
18  you see that?
19            THE WITNESS:  I can.  I see it.
20       Q    Okay.  What is Exhibit 16?
21       A    This is a -- this is Robert's attempt to
22  placate me that I will be paid ultimately for the Basha
23  policy.  So rather than just giving me promises that
24  never materialize, he instructed his sales guys -- well,
25  he told me that he wasn't involved in the raising of
0113
 1  money or how much it -- how much was coming in because
 2  when he was delinquent on the Basha policy, I was
```

```
 3  pressuring him for payment, and he said, you have to
 4  talk to my sales guys, and they'll tell you how much
 5  money is coming in and when you'll be getting paid.  So
 6  it started --
 7       Q    So --
 8       A    It started out that they said, well, we're
 9  talking to people and talking to agents, and we hope
10  money will be coming in next month.  And I listened to
11  that for a period of time, and I called Robert back, and
12  I said, Robert, that's just not good enough.  It's just
13  -- your sales team are just making hollow promises to
14  me, and nothing's happening.  And he said, well, we're
15  gonna put it on a spreadsheet for you and you can review
16  it with them on a weekly or biweekly basis to give you
17  some comfort.  This is the document that was created to
18  -- for the sales guys, Nate and Scott, to have a call
19  with me to give me comfort so that I didn't sue him for
20  the balance.
21       Q    So after Nate or Scott would you send you
22  these spreadsheets, you would follow up with a call with
23  them?
24       A    I would.
25       Q    And what would they discuss with you on the
0114
 1  call?
 2       A    Here's the deals that we're working on, and
 3  when we get money in, Robert says you'll be paid.
 4       Q    Did you understand that --
 5       A    My understanding is that these names over
 6  here are life insurance agents or financial advisers.
 7       Q    The names in the first column on this first
 8  page of the spreadsheet here?
 9       A    Right.  So, the -- they were communicating
10  with these agents or advisers to put them to bring
11  investment to their company.
12       Q    Did you take these spreadsheets and Mr.
13  Mueller's comments to you to mean that Mr. Mueller was
14  relying on incoming investor money in order to be able
15  to pay off the Basha policy.
16       A    Yes.  One hundred percent.
17       Q    Was there any other source of revenue that
18  you were aware of?
19       A    I don't know.  This is where I was directed
20  by Robert Mueller.
21       Q    Did Robert Mueller ever indicate to you
22  that there was any other potential source of money
23  coming in?
24       A    No.  Lemme think about that.  Potential
25  source of money?  He was full of promises, grand
0115
 1  promises.
 2       Q    Can you give me an example?
 3       A    Next year, we're gonna be a huge fund and
 4  we're gonna buy tens of millions of dollars of policies
 5  from you.  Our funds are gonna be extremely successful,
```

```
22        Q    That e-mail.  And then the first e-mail --
23   or the last e-mail chronologically, this year.  Let me
24   know when you're done.
25        A    I'm done.
0145
 1        Q    Mr. Andrew, do you recognize Exhibit 21?
 2        A    Yes.  It's an e-mail chain between Robert
 3   Mueller and I.
 4        Q    In the March 31st e-mail from Mr. Mueller
 5   to you, the second sentence, he wrote neither of us
 6   benefits from either of us going down.  What does that
 7   mean to you?
 8        A    Yeah.  I don't know what he means by that.
 9   I don't know.  Going down potentially means getting in
10   trouble.  I was simply a supplier of tertiary policies
11   to one of his companies.  So, there was no issue of me
12   going down.  Maybe that's some sort of veiled threat to
13   me that I should be patient.
14        Q    Why was -- I get the sense from this e-mail
15   that Mr. Mueller felt like his business was going down.
16   What -- why would that be the case at this point in
17   time?  In 2019?
18        A    Well, I don't know.  But it's evident here
19   that he's struggling to pay off the Basha policy.  I'm
20   assuming this is related to the Basha policy.
21        Q    And him trying to repay you or make his
22   $800,000 payment that he had due to you on the Basha
23   policy?
24        A    Well, I don't -- yes and no.  Yes.  His
25   payment on the Basha policy.  But again, in this period
0146
 1   of time, I don't know what the outstanding balance was.
 2   It certainly wouldn't be less than the 800, plus or
 3   minus, thousand dollars.  But it could have been more.
 4   I don't remember.
 5        Q    So, the line in the same paragraph that
 6   begins but.  Do you see that?  But I am in the dark.
 7        A    Yes.  I see it.
 8        Q    So, Mr. Mueller wrote, but I am in the dark
 9   as to your agreement with your lender as that lender,
10   and then in parentheses, nor your terms with him, end
11   parentheses, was not a party to our contract.  So, I am
12   at a loss as to how to respond to his sudden
13   acceleration of the loan, why it was collateralized on
14   your home, rather than the policy, or how that is tied
15   to our agreement for the Basha policy.  Can you explain
16   what is going on here?
17        A    Sure.  There was no lender and there was no
18   loan on my home.  But that was my effort to try to get
19   Robert to focus on paying off the outstanding balance.
20   Because just paying his obligation wasn't important to
21   him.  So, I took a stab at trying to appeal to his human
22   side, to tell him that I could lose my home.  I had an
23   investor that was applying pressure to me.  To see if I
24   could tap into something that would help him -- help
```

```
25   motivate him to pay off his outstanding balance.
0147
 1        Q    So, you lied to Mr. Mueller about the
 2   existence of a loan, it being collateralized on your
 3   home?
 4        A    I did.
 5        Q    Did you lie to him on other occasions as
 6   well?
 7        A    Not that I can remember.  I was in a pretty
 8   aggravated state at this point.
 9        Q    Mr. Mueller then --
10        A    Let me --
11             EXAMINATION BY MR. SCHULTZ:
12        Q    Mr. Andrew, did you ever, at this point,
13   consider just saying forget it.  I'm going to write off
14   the $800,000 or I'll sue him or do something else?
15        A    I considered suing him for it.  But Robert
16   had a way of making people believe that he was honest
17   with his words and intentions.  And clearly, I reached a
18   point where I no longer believed that.  But there was a
19   -- quite a long period of time when he would make
20   promises to me and I believed him.  So, I held off with
21   action.  Because I was just hopeful that we could
22   resolve it.  Robert would ebb and flow when it came to
23   ordering me to buy policies.  So, I was hopeful that it
24   would flow again.  And he would have money to pay his
25   obligation.
0148
 1        Q    You used a term there.  He would ebb and
 2   flow on ordering me to buy policies.
 3        A    Sure.
 4        Q    What do you mean by that?  Ordering you to
 5   buy policies?
 6        A    I was a supplier.  He would contact me and
 7   say, Tom, I need policies.  Go buy me policies.  I need
 8   X-million in face.  Or I need -- whatever.  He would
 9   tell me.  Go fill the order.  And sometimes he would pay
10   for those policies immediately.  And that would give me
11   hope that that type of behavior would continue.
12        Q    Okay.
13             EXAMINATION BY MR. BERELOVICH:
14        Q    Mr. Andrew, are you and Mr. Mueller still
15   in contact?
16        A    No, we're not.
17        Q    Did you have any contact with him after
18   that phone conversation you testified to earlier where
19   you explained to him the sale price of the Basha policy?
20        A    My recollection is that was the last
21   contact I had with him.
22        Q    So, you have no continuing professional or
23   personal relationship with him?
24        A    I never had a personal relationship with
25   him.  And I do not have a continuing professional
0149
 1   relationship with him.
```

```
 5   investment to their company.
 6       Q   What the falling out --
 7       A   Mister -- Cary may be of value.
 8       Q   I'm sorry.  I didn't, again, didn't mean to
 9   cut you off.
10       A   Cary may be of value to you.
11       Q   You mentioned a falling out.  Can you
12   provide more details on that?
13       A   Yeah.  From Robert's words, he said that he
14   was very shocked and disappointed in his brother because
15   his brother had suddenly told him that he didn't want to
16   work with him anymore.  That he was leaving the
17   business.  And he was -- he expressed that he was
18   disappointed and upset with his brother.
19       Q   Was there any indication as to why he was leaving?
20       A   No.  He didn't share that with me.
21       Q   Was Cary Mueller involved in purchasing
22   policies from you?
23       A   Definitely.  Definitely not.  No one from
24   their side was involved in purchasing policies.  I was a
25   supplier.  An independent supplier.
0152
 1       Q   I think what we were asking was did Cary
 2   Mueller interact with you as part of their purchasing
 3   policies from you?
 4       A   No.
 5       Q   Is there anyone else, aside from the
 6   individuals you just mentioned, Nate, Scott, and Cary,
 7   that we should speak to, to learn more about what we've
 8   been discussing today?
 9       A   No one that I can think of.
10       Q   Mr. Andrew, before we conclude your
11   testimony today, do you wish to clarify anything or add
12   anything to the statements you've made today?
13       A   No.  I don't think so.
14       Q   Ms. Collings, do you wish to ask any
15   clarifying questions?
16           MS. COLLINGS:  No.  Thank you.
17           MR. BERELOVICH:  Okay.  Mr. Andrew, we have
18   no further questions at this time.  We may, however,
19   call you again to testify in this investigation.  Should
20   that be necessary, we will contact your counsel.
21           We are off the record at 4:16 p.m. Eastern,
22   Thursday, May 27, 2021.
23           (Whereupon, at 4:16 p.m., the examination
24   was concluded.)
25                   * * * * *
0153
 1              PROOFREADER'S CERTIFICATE
 2
 3   In the Matter of:   DEEPROOT 575 FUND, LLC
 4   Witness:            Thomas Andrew
 5   File No:            HO-14036-A
 6   Date:               Thursday, May 27, 2021
 7   Location:           Washington, D.C.
```

```
 8
 9          This is to certify that I, Christine Boyce,
10     (the undersigned) do hereby certify that the foregoing
11     transcript is a complete, true and accurate transcription
12     of all matters contained on the recorded proceedings of
13     the investigative testimony.
14
15
16
17
18     _____    5-28-2021
19
20
21
22
23
24
25
0154
 1                    REPORTER'S CERTIFICATE
 2
 3        I, Eric Leichter, reporter, hereby certify that the
 4     foregoing transcript is a complete, true and accurate
 5     transcript of the testimony indicated,
 6     held on 5-27-21, at Washington, D.C., in the matter of:
 7     DEEPROOT 575 FUND, LLC
 8
 9     I further certify that this proceeding was recorded by me,
10     and that the foregoing transcript has been prepared under
11     my direction.
12
13
14
15     5-28-2021
16
17
18
19
20
21
22
23
24
25
```