IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

<table>
<tr><td>UNITED STATES OF AMERICA<br><br>Plaintiff<br><br>v.<br><br>ROBERT JEFFREY MUELLER<br><br>Defendant</td><td>Case No.: 5:24-CR-00563-XR</td></tr>
</table>

## DEFENDANT'S MOTION *IN LIMINE*

TO THE HONORABLE COURT:

Defendant Robert Jeffrey Mueller ("**Mr. Mueller**" or "**Defendant**") files this Motion *in Limine*, and in support would respectfully show:

### I.       INTRODUCTION

As noted in Mr. Mueller's Opposed Motion to Continue Trial Setting (ECF No. 48), this prosecution appears to be in a state of flux. Just last week, the Government secured a Superseding Indictment that substantively modified its allegations against Mr. Mueller, including by alleging for the first time that Mr. Mueller misrepresented the "financial condition" of the Deeproot companies.[1] *See* ECF No. 39. The prosecution that appears to be developing is problematic in multiple ways. Among other issues detailed below, the Government appears intent on prosecuting this case based on statements not made by or attributable to Mr. Mueller, using inflammatory and inappropriate terminology, and other evidence that is not relevant to the charges pending in this case or is unfairly prejudicial to Mr. Mueller.

---

[1] Mr. Mueller founded and managed the Deeproot family of companies, which included Policy Services, Inc., deeproot Grown Runs Deep Fund, LLC (the "**dGRD Fund**"), and deeproot 575 Fund, LLC (the "**575 Fund**," and collectively with the dGRD Fund and other related companies, "**Deeproot**").

Mr. Mueller therefore respectfully requests that the Court exclude the evidence and enter the other rulings detailed below under Federal Rules of Evidence.

## II.   BACKGROUND

Mr. Mueller founded and managed the Deeproot family of companies. Those companies solicited investments that it used to purchase shares in life insurance policies and invest in various affiliated businesses. Before Deeproot would accept any investment, each investor was required to sign and initial a Subscription Agreement in which they represented that they had reviewed and understood the relevant Private Placement Memorandum ("**PPM**"), among other representations. *See* Exhibit A (2019 575 Fund PPM).[2] The PPMs included carefully vetted language that described the Deeproot companies and the various risks associated with the investment. *See* Ex. A.

In its initial years, Deeproot used most of its investment capital to purchase life insurance policies. Over time, and as disclosed in PPMs and other materials, Deeproot shifted its investment strategy to include ventures designed to yield short-term cash flow, including the design, manufacture, and sale of cutting-edge pinball machines. The development of the pinball business was slowed by the pandemic but had regained momentum by early 2021, with the first pinball machines scheduled to ship in August of 2021 and expected to yield millions of dollars in revenues annually. But the intervention of the Government—in the form of a civil complaint filed by the SEC—forced Deeproot into bankruptcy on the eve of the completion of the first pinball machines.

The SEC and Mr. Mueller litigated the SEC claims from 2021 to 2024. Discovery in that case include depositions of several witnesses likely to testify in the criminal case, including former counsel for Deeproot and Mr. Mueller Dennis Concilla. On January 11, 2024, the Court granted in part and denied in part the SEC's Motion for Summary Judgment. *See* ECF No. 135 in *Sec. and*

---

[2] The Subscription Agreements include sensitive personal information of investors and can be provided in redacted form or under seal, if requested.

*Exch. Comm. v. Mueller*, Civil Action No. 5:21-cv-785-XR (W.D. Tex.) (the "**SEC Case**"). On June 10, 2024, Mr. Mueller and the SEC informed the Court of a potential resolution of the SEC's claims, which was followed by a motion for entry of a Consent Judgment agreed to by Mr. Mueller on June 20. 2024. *See* SEC Case, ECF Nos. 160, 161. But, after the Government returned its original Indictment, the Court stayed the SEC case pending resolution of this case. *See* SEC Case, ECF No. 171.

On December 8, 2022, the Trustee in the bankruptcy case involving the Deeproot companies filed a complaint against Mr. Mueller in an adversary proceeding. *See* ECF No. 1 in *In re: Deeproot Cap. Mgmt.*, Adv. Proc. No. 22-05097 (W.D. Tex. Br.) (the "**Adversary Case**"). On May 18, 2023, the Court in the Adversary Case entered an Agreed Order that abated the Adversary Case until final judgment is entered in the SEC case. *See* Adversary Case, ECF No. 24.

The Government filed the original Indictment against Mr. Mueller on November 6, 2024. *See* ECF No. 1. It asserted eight counts of wire fraud and alleged that Mr. Mueller engaged in a scheme to defraud investors in the Deeproot companies from April 2019 to June 2021. *Id.* The Indictment alleged that Mr. Mueller carried out this scheme through manner and means that included a defined list of material misstatements and omissions, including allegedly false representations regarding the use of investor funds, alleged false representations that certain of the Deeproot companies had "substantial cash reserves" and were "debt" free, and alleged omissions regarding the purchase, collateralization, and loss of a specific insurance policy (referred to herein as the "Basha" policy). *Id.*

At various dates from February 27, 2025 to March 26, 2026, the Government produced discovery documents to Mr. Mueller, exceeding 52,000 pages. Mr. Mueller has also produced

3

discovery to the Government, including documents acquired through a subpoena to the Trustee in the bankruptcy proceedings concerning the Deeproot Companies.

The parties agreed to continue the trial date on three occasions. The Court granted these motions and entered new scheduling orders on February 26, June 27, and most recently on October 24, 2025, which resulted in the current trial date of April 13, 2026. *See* ECF Nos. 25, 29, 31. The Court also set the deadline for the filing of pretrial motions, jury instructions, and voir dire questions for Friday, March 27, 2026. *See* ECF No. 31. On March 25, 2026, Mr. Mueller filed an Opposed Motion to Continue Trial Setting, which remains pending. *See* ECF No. 48.

On February 26, 2026, the Government filed its Motion *In Limine* to Exclude Evidence (the "**Government's MIL**"), which sought to exclude evidence concerning the amounts paid by a broker (Thomas Andrew) to purchase insurance policies that were later resold to Deeproot. *See* ECF No. 32. Mr. Mueller filed his Response to the Government's MIL on March 3, 2026, arguing that various aspects of Mr. Andrew's interactions with Deeproot could be relevant to cross-examination depending on Mr. Andrew's testimony on direct. *See* ECF No. 36. On March 19, 2026, the Court entered an Order granting the Government's MIL and holding that evidence that Mr. Mueller was defrauded "is not relevant to whether the defendant made false representations to . . . investors." ECF No. 38.

On March 19, 2026, the Government secured a Superseding Indictment. *See* ECF No. 39. The Superseding Indictment dismisses three of the eight counts included in the original Indictment and rewrites the alleged manner and means. *Id.* Among other changes, the Government has replaced several of the specific enumerated alleged misrepresentations identified in the original Indictment, including the paragraphs regarding the Basha policy, the supposed misrepresentation regarding "debt," and the supposed misrepresentation regarding "substantial reserves." *Compare*

ECF No. 1 *with* ECF No. 39. In their place, the Government asserts a broadly worded catch-all allegation: "**MUELLER** falsely represented and caused others to represent to Victim Investors the financial condition of the deeproot family of companies to Victim Investors." ECF No. 39 ¶ 14.

On March 25, 2026, Mr. Mueller filed an Opposed Motion to Continue Trial Setting, which asked the Court to continue the trial date in this matter based on the Superseding Indictment and other factors. *See* ECF No. 48.

### III.     REQUESTS TO EXCLUDE OR LIMIT EVIDENCE

Evidence is relevant if "(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401. Irrelevant evidence is inadmissible. *See* Fed. R. Evid. 402. "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. Evidence may also be excluded for other grounds, including (as most relevant to this case) Rule of Evidence 404 (governing admission of character evidence and other crimes, wrongs, or acts).

Mr. Mueller respectfully requests the Court exclude or limit the Government's use of the evidence detailed below.

#### A.     Evidence Regarding Statements Not Attributable to Mr. Mueller

As noted in Mr. Mueller's response to the Government's MIL, Mr. Mueller had minimal direct contact with most Deeproot investors. *See* ECF No. 36. For example, of the five investors identified in the Superseding Indictment, only one actually spoke to Mr. Mueller about the potential investment, another had fleeting, non-substantive contact with Mr. Mueller, and the other

three had no contact with him at all.[3] For the significant majority of investors, their only direct contact with Deeproot was through a video presentation in which a sales representative reviewed a pre-approved PowerPoint presentation and through written materials, including a Subscription Agreement and a PPM.

Most investors found their way to Deeproot through "finders," independent advisors who received a fee if they referred clients to Deeproot. Many of these finders had minimal or no contact with Mr. Mueller. Rather, these finders signed agreements with Deeproot in which they agreed they had no responsibility to communicate with potential investors regarding Deeproot. *See* Exhibit B (sample Finder Agreement, redacted). They were also directed not to provide any substantive information regarding Deeproot to investors other than pre-approved materials, such as the PPMs. *See* Ex. C (presentation to finders). But, based on Government interviews with investors, it appears that some finders may have freelanced and given investors incorrect information regarding Deeproot or the ways in which investor money would be used. Specifically, it appears that several of the investors named in the Superseding Indictment may have received erroneous substantive information on Deeproot from finders.

There is *no* evidence that Mr. Mueller directed, approved, or was even aware of these finders' statements. Indeed, as noted above, all the evidence indicates the contrary—i.e., that Deeproot repeatedly told finders not to provide substantive information regarding Deeproot to investors. *See* Ex. B; Ex. C. Without a clear link to Mr. Mueller, any testimony by investors or finders regarding false or misleading information provided by finders to investors is entirely irrelevant to any issue in this case. Such testimony would not indicate that an alleged scheme to

---

[3] Reports of Government interviews with these investors were produced in discovery. Mr. Mueller can provide any reports requested by the Court, likely in redacted form or under seal to protect confidential information.

defraud **led by Mr. Mueller** existed. *See* Fed. R. Evid. 401; Fifth Circuit Pattern Jury Instructions (Criminal Cases) § 2.57. It would not support the conclusion that **Mr. Mueller** made or directed any representation that he knew to be false or misleading. *See also United States v. Harris*, 821 F.3d 589, 598 (5th Cir. 2016) ("Our case law indicates that in order to show a scheme to defraud, the government 'ha[s] to prove that [the defendant] made some kind of a false or fraudulent material misrepresentation.'") (*quoting United States v. Curtis*, 635 F.3d 704, 718 (5th Cir. 2011)) And it certainly is not relevant to show that Mr. Mueller intended to defraud any of these investors. *See id;*.

Even if this evidence were marginally relevant, it would be unfairly prejudicial to Mr. Mueller. *See* Fed. R. Evid. 403. Allowing witnesses to testify about statements that cannot be attributed to Mr. Mueller could confuse the jury as to what materials are actually germane to the case. It would also invite the jury to convict Mr. Mueller for supposed negligence in oversight of finders or to make investors "whole," neither of which is a proper consideration in this criminal wire fraud case. It could also open up otherwise unnecessary inquiries into communications between finders and Deeproot staff, between finders and other investors, and other peripheral issues.[4] All these risks warrant exclusion or limitation of this evidence under Rule 403.

Mr. Mueller therefore respectfully requests the Court exclude all testimony regarding statements by finders to investors regarding Deeproot, unless the Government can lay a foundation that Mr. Mueller made or approved the alleged statement. This limitation would include potential testimony from M.M., J.K., and B.L., as well as the finders who worked with them (i.e., Mark Zabinski and Darryl Fields), potentially among other witnesses.

---

[4] As out-of-court statements by a non-party, evidence regarding a finder's statement to a witness could also constitute hearsay, depending on the purposes for which the Government uses such evidence. *See* Fed. R. Evid. 801.

**B.  Statements to Investors That Are Not Relevant to the Alleged Scheme to Defraud**

As noted above, the Superseding Indictment alleges that Mr. Mueller carried out his alleged scheme to defraud through a limited set of manner and means—i.e., that Mr. Mueller made or caused others to make: (1) false representations that "'the simple majority of our Fund Assets' would be used by the 575 Fund to invest primarily in 'Life Policies'"; (2) false representations that "income to the investors in the 575 Fund would come from fund revenues"; (3) false representations "the financial condition of the deeproot family of companies"; (4) the material omission that "[n]o life settlements policies were purchased by deeproot after May 17, 2017; and (5) the material omission that a "significant portion of funds being invested . . . was being used to repay earlier investors their principal and interest." ECF No. 39 ¶¶ 10–15.

Any evidence of allegedly false or misleading statements other than those listed in the indictment is therefore, by definition, not part of the alleged scheme to defraud. Indeed, evidence of an alleged scheme to defraud that is materially different than that alleged in the Superseding Indictment could constitute a material variance or constructive amendment. *See United States v. Stanford*, 805 F.3d 557, 565 (5th Cir. 2015) ("A constructive amendment occurs when the government changes its theory at trial, allowing the jury to convict on a broader basis than that alleged in the indictment . . . ."); *United States v. Mitchell*, 484 F.3d 762, 769 (5th Cir. 2007) ("A material variance occurs when the proof at trial depicts a scenario that differs materially from the scenario charged in the indictment but does not modify an essential element of the charged offense." (internal quotation marks omitted)).

As noted in Mr. Mueller's recent Opposed Motion to Continue Trial Setting, the Superseding Indictment's new allegation that Mr. Mueller falsely represented the "financial condition" of Deeproot could open up a wide variety of potential new theories, resulting in

8

significant prejudice to Mr. Mueller. *See* ECF No. 48. But even the Superseding Indictment sets limits. It does not, for example, state that the manner and means "include" those listed in the Superseding Indictment or any other language suggesting that the identified manner and means extend beyond those listed. *See* ECF No. 39. Even the term "financial condition" can only be stretched so far. *Id.*

As one example of evidence or questioning that could be beyond the scope of the Superseding Indictment, the Government apparently intends to introduce evidence that Deeproot secured PPP loans during the pandemic to support its allegation that Mr. Mueller misrepresented that the "financial condition" of Deeproot. To the extent that the Government goes further and alleges, for example, that Mr. Mueller misled the United States through the PPP loan application or other documents, such evidence would be materially different than the allegations in the Superseding Indictment and thus not be intrinsic to the scheme to defraud.[5]

Moreover, the Government has provided no notice of its intent to introduce any evidence regarding alleged bad acts under Rule 404(b). *See* Fed. R. Evid. 404(b)(3). Even if the Government had provided such notice, any such evidence would be in admissible to show Mr. Mueller's character or that his actions identified in the Superseding Indictment were consistent with that purported character. *See* Fed. R. Evid. 404(b)(1).

Mr. Mueller therefore respectfully requests the Court exclude any evidence of alleged false statements or material omissions other than those related to the manner and means alleged in the Superseding Indictment.

---

[5] Such evidence could also be objectionable under Rule 403.

## C.  Testimony of Thomas Andrew

As noted above, up until April 2019, Deeproot bought insurance policies from Thomas Andrew, a broker who bought and sold insurance policies. In its Order granting the Government's Motion in Limine, the Court ruled that Mr. Mueller may not cross-examine Mr. Andrew regarding the amounts he paid for policies he later resold to Mr. Mueller at a markup. *See* ECF No. 38. The Court reasoned that "[t]he relevant inquiry is whether the defendant knowingly made false representations to the investors about how their money would be invested" and whether the defendant acted with "fraudulent" intent. *Id.* at 2–3. Mr. Mueller asks to Court to extend the Order to apply to the direct testimony of Mr. Andrew and seeks clarification on the scope of permissible cross-examination.

First, Mr. Mueller asks the Court to exclude Mr. Andrew's testimony in its entirety. After the Court's Order and the Superseding Indictment there appears to be no appropriate subject for Mr. Andrew's testimony. It is undisputed that Deeproot's interactions with Mr. Andrew ***entirely*** predate the alleged scheme to defraud. Indeed, it appears that the Government chose to start the alleged scheme to defraud on the date of Mr. Mueller's last interaction with Mr. Andrew. *See* ECF No. 39 (alleging that the scheme to defraud began on April 8, 2019,); Exhibit D at 144:1-9, 146:8-147:4, 148:17-149:1 (Andrew SEC deposition excerpts). Mr. Andrew therefore has no knowledge of and cannot plausibly testify regarding "representations to the investors about how their money would be invested" during the period of the alleged scheme—and certainly not for the five investments specifically identified in the indictment, which came more than a year after Mr. Andrew left the scene. *See* ECF No. 39 (specifying counts starting in October 2020 through June 2021); Ex. D at 148:17–149:6.

Similarly, Mr. Andrew's testimony regarding Deeproot's purchase and eventual return of the Basha policy is no longer relevant to Government's alleged manner and means. As noted above, the original Indictment specifically alleged that it was material omission for Mr. Mueller to fail to disclose several aspects of the Basha transaction, including the face value of the policy, the amount of the loan taken against it, and the amounts lost when the policy was returned and sold. *See* ECF No. 1 ¶¶ 15(c)–(d). The Government has now abandoned those allegations in favor of the Superseding Indictment's catch-all allegation regarding false representations of Deeproot's "financial condition." *See* ECF No. 39. But the Government has never identified a "representation" during the alleged time period—false or otherwise—that is plausibly related to the Basha policy, borrowing against the policy, the loss of the policy, or the loss of the money invested in the policy. Indeed, the PPMs relevant to the alleged time period repeatedly warn investors that they might lose their investments and say nothing, one way or another, about "debt," "loans," or "borrowing" against policies. *See, e.g.*, Ex. A.

Mr. Andrew cannot even credibly testify about whether Deeproot purchased any life insurance policies after the Basha policy. He had no contact with Deeproot at any time during the relevant time period and thus has no idea how Deeproot spent investor money, whether it bought additional life insurance policies, or whether it spoke with other life insurance brokers about potential purchases after April 8, 2019. *See* Ex. D at 148:17–149:6. Moreover, the fact that the last life insurance policy that Deeproot attempted to purchase was the Basha policy is undisputed and admissible through any number of sources that do not come with Mr. Andrew's baggage and potential for unfair prejudice.

Similarly, Mr. Andrew cannot plausibly testify regarding Mr. Mueller's intent in making any of the alleged false statements or material omissions. He has no knowledge regarding any of

11

Mr. Mueller's interactions with investors or finders during the relevant time period, no knowledge regarding whether any of the PPMs included false statements or material omissions, no knowledge regarding Deeproot's purchases or spending, and no contact with Mr. Mueller after April 4, 2019— and thus no basis to testify regarding Mr. Mueller's subject intent. *See* Ex. D at 148:17–149:6.

The Government has suggested that Mr. Andrew's testimony would be relevant to providing background regarding the alleged scheme. But "background" is not an element of the alleged offense, and nothing in Mr. Andrew's potential testimony makes any element of the offense more like than not to have occurred. *See* Fed. R. Evid. 401. Indeed, it appears that the primary purpose of Mr. Andrew's testimony may be to introduce purported prior bad acts evidence under Rule 404(b). But, as noted above, the Government has provided no notice of intent to use such evidence under Rule 404(b)(3) or identified any basis to believe such evidence would be permitted under Rule 404(b)(2).

Even if there were a sliver of relevance to Mr. Andrew's testimony, that relevance would be grossly outweighed by the unfair prejudice that would result. As noted in Mr. Mueller's response to the Government Motion in Limine, the interactions between Mr. Mueller and Mr. Andrew are complex, span years and the purchase of more than a dozen life insurance policies, concern more than a dozen written agreements, involve multiple Deeproot employees, and feature a brazen act of fraud by Mr. Andrew at its center. *See* ECF No. 36. Permitting Mr. Andrew to testify may open the door to a host of potential side issues that could consume the trial in this matter, confuse and distract the jury from relevant issues, and result in significant unfair prejudice to Mr. Mueller. *See* Fed. R. Evid. 403. The better course would be to exclude Mr. Andrew altogether.

Second, in the alternative and if the Court permits Mr. Andrew to testify, Mr. Mueller requests clarification regarding the scope of the Court's Order. Mr. Mueller's response to the

Government's MIL noted that Mr. Mueller did not intend to introduce evidence regarding the amounts Mr. Andrew paid for life insurance policies in a Defense case, should Mr. Mueller present such a case. *See* ECF No. 36. But the Response also pointed out multiple ways in which Mr. Andrew's interactions with Mr. Mueller could provide a legitimate basis for impeachment, including that Mr. Andrew's admission under oath that he lied to Mr. Mueller and that Mr. Andrew's testimony was motivated by an interest in avoiding prosecution for wire fraud. *See id.* at 7-9. The Government's motion did not directly address those issues, moving to limit evidence regarding the price at which Mr. Andrew purchased policies. *See* ECF No. 35. The Court's Order was similarly focused on the price of policies. *See* ECF No. 38.

Mr. Mueller maintains that such cross-examination is both routine and guaranteed under the Confrontation Clause. *See United States v. Jimenez*, 464 F.3d 555, 562 (5th Cir. 2006) (holding that refusal to permit cross-examination on a government witness' credibility violated the Confrontation Clause); *United States v. Alexius*, 76 F.3d 642, 646-47 (5th Cir. 1996) (holding that district court erred in denying cross-examination of Government witness regarding motive to curry favor with the Government and reversing conviction). Mr. Mueller therefore requests clarification that he may pursue all appropriate impeachment of Mr. Andrew's testimony, other than questions regarding the price at which he purchased policies that he later resold to Deeproot.

### D. Evidence Regarding the Impact of Lost Investments

The Government is expected to call investors to testify regarding the alleged representations and omissions that led them to invest in Deeproot. Based on statements of these witnesses to federal agents, it appears that the Government may attempt to elicit testimony regarding the impacts caused by the loss of these witnesses' investments in Deeproot, including

testimony regarding the personal harms caused by loss of retirement funds and other purported collateral effects of the loss.

Such testimony is inadmissible under Rules 401 and 403. Testimony regarding the personal or financial impact of losing an investment in Deeproot is not relevant to any element of the charged offenses, which do not require that the Government prove loss as a result of the alleged wire fraud. *See* 18 U.S.C. § 1343; *United States v. Swenson*, 25 F.4th 309, 319 (5th Cir. 2022) ("[T]o prove fraud, the government is not required to prove that any victim actually suffered a loss."). Moreover, there is no evidence that Mr. Mueller believed these investors would suffer a loss, was indifferent to their loss, or any other evidence that could be relevant to proving his specific intent to defraud. Moreover, any potential relevance is substantially outweighed by the prejudicial effects of potentially sympathetic witnesses testifying regarding personal hardships, which could lead a jury to convict in order to compensate investors rather than on the elements of the offense. *See* Fed. R. Evid. 403.[6]

Other courts have excluded such testimony regarding the collateral effects of a witness' alleged loss under Rule 401 and 403. For example, in *United States v. Copple*, 24 F.3d 535, 544-547 (3d Cir. 1994), the district court permitted the Government to introduce evidence regarding the losses suffered by alleged victims in a mail fraud scheme, including testimony regarding the personal, financial, and health effects of the loss. The Third Circuit noted that "[p]roof of actual loss by the intended victim is not necessary" to prove mail fraud, but that such evidence could be

---

[6] Such testimony could also open the door to evidence regarding causation—i.e., why those witnesses lost their investments in Deeproot. As the Court may be aware, Mr. Mueller has consistently maintained that the SEC's refusal to delay the filing of its complaint until Deeproot had the opportunity to sell its assets for full value substantially diminished amounts that could be returned to investors. If the Government seeks to prove that Mr. Mueller caused harm to these investors, Mr. Mueller would be entitled to present evidence that the harm was in fact caused by the SEC's indifference and impatience.

relevant to show specific intent to defraud, "with the qualification that district judges exercise their wise discretion in imposing limits on such testimony." *Id.* at 544–45. But the court also ruled that the district court erred in permitting testimony regarding the "particular personal or professional impact the losses had" on the alleged victims, holding that such testimony "created a significant risk that the jury would be swayed to convict [the defendant] as a way of compensating these victims without regard to evidence of [the defendant's] guilt" and thus was inadmissible under Rule 403. *Id.* at 545–46; *see also United States v. Seko*, 1:15-cr-301, 2016 WL 7638436, at *2–3 (E.D.V.A. Dec. 20, 2016) (following *Copple*, permitting testimony relevant to proving the scheme, but excluding evidence regarding "collateral consequences," including that "some of the victims subsequently lost their homes").

Mr. Mueller therefore respectfully requests the Court exclude any testimony regarding the collateral effects of the losses suffered by investors under Federal Rules of Evidence 401 and 403.

### E.  Use of the Terms "Victim" or "Victim Investors"

The Superseding Indictment uses the term "Victim Investors" to describe the investors in Deeproot. Any use of the term "Victim Investors" or "victims" to describe these investors would unfairly prejudicial and should be excluded.

The term "victim" presupposes that a crime has been committed. Its use by prosecutors or witnesses, particularly if used frequently in a trial and/or condoned by the Court, can infer that the Government has already proven a core element of the offense. As the use of the term itself has no probative value, the potential unfair prejudice plainly outweighs the Government's use of the term. *See* Fed. R. Evid. 401; Fed. R. Evid. 403. There is also no reason to use the term "victim" or "victim investor" in this case. The Government can simply use the term "investor" and avoid potential prejudice to Mr. Mueller.

A court in this District recently granted a motion in limine to exclude just such use of the term "victim." In *United States v. August*, 590 F.Supp.3d 972, 974 (W.D. Tex. 2022), the court reasoned that the Government's use of the term "victim" to describe individuals allegedly harmed by the defendant's actions "is unfairly prejudicial as it encourages the jury to find guilt from improper reasoning, i.e., due to the implication that a crime has already been committed by Defendant." (alterations and quotation marks omitted). The court noted that the "Government can still ensure the allegedly harmed individuals are treated with fairness, dignity, and respect for their privacy without referring to them as victims" and granted the defendant's motion in limine to preclude the use of the term. *Id.*

A number of other courts have reached similar conclusions and prohibited prosecutors and witnesses from referring to allegedly affected individuals as "victims." *See, e.g.*, *United States v. Hollington*, Case No. 3:22-cr-141, 2023 WL 4315747, at *8 (M.D. Fla. July 3, 2023) (holding that risks of "unduly prejudicing" the defendant and ordering that "the Government may not refer to the patients as 'victims" throughout the trial"); *United States v. Spayd*, Case No. 3:19-cr-0111, 2022 WL 4367621, at *11 (D. Alaska Sept. 20, 2022) (granting motion in limine and precluding the Government and its witnesses from using the term "victim"); *United States v. Sena*, No. 19-CR-01432, 2021 WL 4129247, at *1 (D.N.M. Sept. 9, 2021) ("Mr. Sena is correct that the term is prejudicial when the core issue at trial is whether a crime has been committed—and therefore, whether there is a victim.").

Mr. Mueller therefore respectfully requests the Court prohibit Government counsel or its witnesses from using the terms "victim" or "victim investors" before the jury in this case.

### F.  Use of the Terms "Ponzi" or "Ponzi-like"

Mr. Mueller also requests the Court limit the use of the term "Ponzi scheme" and preclude use of the term "Ponzi-like payments". There are varying definitions as to the types of arrangements that could constitute a "Ponzi" scheme, but a commonly identified characteristic is the lack of spending on operations of the company. *See In re Rose*, 425 B.R. 145, 152-55 (E.D. Pa. Br. 2010) (summarizing the varying definitions). The Superseding Indictment does not allege that Mr. Mueller ran a "Ponzi" scheme. *See* ECF No. 39. The evidence also does not support such a finding, as it is undisputed that Deeproot owned policies and spent significant funds on its pinball business. But in other cases—notably the SEC Case—opposing parties used "Ponzi-like payments" or "Ponzi payments" to refer to the regular monthly payments made to investors in the 575 Fund, and the Court should not permit the Government to do so here.

There is no probative value to the term itself, as the Government must still prove that Mr. Mueller made material misstatements or omissions regarding the 575 Fund payments. The term may also be confusing, inflammatory, and unnecessarily prejudicial, as jurors may be familiar with the term "Ponzi scheme" and unfairly associate Deeproot with other well-known cases. Regular use of the term "Ponzi scheme," "Ponzi payments," or "Ponzi-like" payments should therefore be excluded under Rule 403.

Mr. Mueller recognizes that the testimony of one Government witness may include reference to the term "Ponzi scheme" in the witness' resignation letter, though that witness testified in the SEC case that he did not believe Deeproot was a "Ponzi scheme." Any use of the term outside of that witness's testimony or to rebut that testimony, however, would be inflammatory and unduly prejudicial.

17

### G.  <u>Evidence Regarding Deeproot Payments to Mr. Mueller</u>

As detailed in the briefing regarding Mr. Mueller's Opposed Motion to Continue Trial Setting, it appears that the Government has overhauled its case against Mr. Mueller at the last minute. *See* ECF Nos. 48–51. It now apparently intends to pursue allegations that Mr. Mueller misrepresented that he would be receiving a salary for managing, allegations that likely would not have been permitted under the original Indictment. *See* ECF No. 1; ECF No. 51, Ex. A. The allegation is entirely baseless, as the PPMs explicitly state that Mr. Mueller would receive a salary. *See* Ex. A at 12 ("Robert is paid a salary from the Ultimate Parent for all services provided across all the entities"). But if the Government does pursue these allegations at trial, the only relevant information is the amount of payment—whether in salary or another form—that Mr. Mueller received, not what he did with those payments.

Mr. Mueller is willing to stipulate as to the total amount of salary and "payment of personal expenses." Mr. Mueller will work with the Government to identify the amount of salary and expenses received during the time period of the Superseding Indictment. Because Mr. Mueller will stipulate and agree to the total amounts of compensation and payments for personal expenses he received, introduction of the ***nature*** or ***subsequent use*** of any payments (e.g., school tuition, clothing, jewelry, vacations, etc.) would be entirely irrelevant to any element of the offense. Evidence regarding Mr. Mueller's use of these funds could only be offered to prejudice Mr. Mueller and inflame the jury. *See* Fed. R. Evid. 403.

Permitting the Government to introduce highly inflammatory evidence regarding the use of funds would also compound the prejudice caused by the Government's last-minute rewrite of its pleadings. Specifically, permitting such evidence could require rebuttal evidence that it is common practice in closely held companies for the owner to receive non-payroll payments, which

are treated as loans and are repaid through reductions in income to the owner (or otherwise accounted for) after the company receives sufficient revenue. The Government's late changes in the Superseding Indictment—and its confirmation of the change and significant document production just yesterday—leaves Mr. Mueller with little time to identify an expert or other appropriate witness to testify to this practice, to Mr. Mueller's prejudice.

Mr. Mueller therefore requests the Court exclude any evidence regarding the manner in which Mr. Mueller spent the salary or personal expenses received from Deeproot under Federal Rules of Evidence 401 and 403.

### H.  Limitations on Deposition Testimony of Mr. Mueller

It appears that the Government may introduce deposition testimony of Mr. Mueller from the SEC Case. Questioning in that case was conducted by the SEC, much of which drew objections from Mr. Mueller's counsel regarding form of the questions or other evidentiary issues. Mr. Mueller's testimony may also be irrelevant to the issues in this case or otherwise subject to objection. If the Government intends to use any portion of Mr. Mueller's prior testimony in its case-in-chief, Mr. Mueller requests that the Government provide advance notice of which portions the Government intends to use so that the parties may confer and raise appropriate evidentiary issues to the Court. In addition, Mr. Mueller requests the opportunity to identify any appropriate excerpts to be played at the same time as the Government's excerpts under the rule of completeness. *See* Fed. R. Evid. 106; *United States v. Herman*, 997 F.3d 251, 263–64 (5th Cir. 2021).

### I.  No Expert or Opinion Testimony

The Government has expressly represented that it does not intend to submit any expert opinion testimony in this case. *See* Ex. E. It does, however, intend to call a federal agent to testify

as a summary witness regarding the manner in which Deeproot spent investor money. To the extent that witness testifies regarding his or her opinion regarding how the PPMs and other documents should be interpreted, how certain expenses should be characterized, whether payment of Mr. Mueller's personal expenses was permissible, or any other testimony based on the agent's education, training, and experience, such testimony would be impermissible given the lack of notice regarding expert testimony and the lack of adequate foundation, among other reasons. *See* Fed. R. Crim. P. 16; Fed. R. Evid. 701; Fed. R. Evid. 702.

### J. No allegations, Orders, or Agreements from the SEC Case or Adversary Case

As noted above, litigation in the SEC Case and (to a lesser extent) the Adversary Case lasted for many years. References to these other cases in this prosecution may be inevitable, as many likely witnesses in this case testified in either the SEC Case or one of the adversary proceedings brought by the Trustee. But opposing parties in those cases made accusations in pleadings and other documents in support of claims against Mr. Mueller, none of which are admissible in this case under Rule 401 and 403. Similarly, the Court's Order granting in part and denying in part the SEC's motion for summary judgment is not admissible in this criminal case under Rules 401 and 403. *See* SEC Case, ECF No. 135. Finally, the Consent Judgment in the SEC Case agreed to by Mr. Mueller is not an admission of guilt in this case, involves different issues of law and fact, is not probative of any element of the offenses charged, and would be unfairly prejudicial to Mr. Mueller. *See* SEC Case, ECF No. 161; *United States v. Cook*, 557 F.2d 1149, 1153-55 (5th Cir. 1978) (holding that permitting Government to introduce in criminal case an agreed injunction from a related SEC case was reversible error).

Mr. Mueller therefore respectfully requests the Court exclude introduce of or any reference to the pleadings, orders, or Consent Judgment in the SEC Case or any other litigation.

## IV.    CONCLUSION

For the reasons stated above, Mr. Mueller respectfully requests the Court exclude evidence and/or enter other appropriate orders, as detailed above.

DATED: March 27, 2026.

Respectfully submitted,

**DAVIS & SANTOS, PLLC**

By: */s/ H. Jay Hulings*
Jason M. Davis
State Bar No. 00793592
Email: jdavis@dslawpc.com
H. Jay Hulings
State Bar No. 24104573
E-mail: jhulings@dslawpc.com
719 S. Flores Street
San Antonio, Texas 78204
Tel: (210) 853-5882
Fax: (210) 200-8395

***Attorneys for Defendant***
***Robert Jeffrey Mueller***

## CERTIFICATE OF SERVICE

I certify that on March 27, 2026, the foregoing document was electronically filed with the Clerk of the Court using the CM/ECF system and all counsel of record will receive an electronic copy via the Court's CM/ECF system.

*/s/ H. Jay Hulings*
H. Jay Hulings