# Exhibit D

THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION

In the Matter of:              )
                               )  File No. HO-14036-A
DEEPROOT 575 FUND, LLC         )

WITNESS:  Thomas N. Andrew
PAGES:    1 through 154
PLACE:    Securities and Exchange Commission
          100 F Street NE
          Washington, D.C.
DATE:     Thursday, May 27, 2021

    The above-entitled matter came on for hearing,
via WebEx, pursuant to notice, at 10:02 a.m.

          Diversified Reporting Services, Inc.
                 (202)467-9200

APPEARANCES:

On behalf of the Securities and Exchange Commission:
    ERIC BERELOVICH, ESQ
    GEORGE BAGNALL, ESQ
    CHRISTIAN SCHULTZ, ESQ
    PAUL BOHR
    SACHIN VERMA
    Counsel, Division of Enforcement
    U.S. Securities and Exchange Commission
    202-551-7799
    bereloviche@sec.gov


On behalf of the Witness:
    SCARLETT COLLINGS, ESQ
    Locke Lord LLP
    600 Travis Suite 2800
    Houston, TX 77002
    713-226-1338
    scarlett.collings@lockelord.com

          C O N T E N T S

you aware of any other sources of income for Deeproot?

A    I'm not.

MR. BERELOVICH:  Give me one moment.  So, I'm trying to open another exhibit but --

THE WITNESS:  Okay.

MR. BERELOVICH:  -- I'm having some technical issues.  So give me one more minute.

0143

THE WITNESS:  While you're doing that, I'm just going to step across the room and get some coffee if that's okay.

MR. BERELOVICH:  Sure.

THE WITNESS:  Okay.  Thirty seconds.

MR. BERELOVICH:  Okay.  Let's try it again. I'm still having some tech issues.  Maybe it's best if we go off the record and take a 10-minute break.

MS. COLLINGS:  Hey, and --

MR. BERELOVICH:  Let's go off the record at 3:40 p.m.

(Whereupon a short recess was taken.)

MR. BERELOVICH:  We're back on the record at 3:58 p.m. Eastern.

EXAMINATION

BY MR. BERELOVICH:

Q    Mr. Andrew, do you understand that you're still under oath?

A    Yes.  I do.

Q    Let me try to share that exhibit that I was previously trying to share.  But failing.  Mr. Andrew, can you see Exhibit 21 on your screen?

(SEC Exhibit No. 21 was marked for identification.)

A    Yes, I can.

0144

Q    I'm displaying on your screen a document that was previously marked as Exhibit 21.  It's a two page e-mail bearing Bates CYCL 006055 through 6056.  And the e-mail is from Tom Andrew to Robert Mueller dated April 1, 2019, subject re:  Follow up.  And, Mr. Andrew, as before, I will -- I'll start at the bottom e-mail in this thread.  I'll scroll through that and then I'll move up.  Does that make sense?

A    Okay.

Q    Let me know when you're ready for me to scroll down here.

A    Okay.  This is where I should begin? Starting with Tom?

Q    Yes.  This is the final e-mail in the chain.  Or sorry.

A    Okay.

Q    The first e-mail in the chain. Chronologically.

A    You can scroll down a little bit.  Okay.

Q    This is the end of --

A    Okay.

Q    That e-mail.  And then the first e-mail -- or the last e-mail chronologically, this year.  Let me know when you're done.

A    I'm done.

0145

Q    Mr. Andrew, do you recognize Exhibit 21?

A    Yes.  It's an e-mail chain between Robert Mueller and I.

Q    In the March 31st e-mail from Mr. Mueller to you, the second sentence, he wrote neither of us benefits from either of us going down.  What does that mean to you?

A    Yeah.  I don't know what he means by that. I don't know.  Going down potentially means getting in trouble.  I was simply a supplier of tertiary policies to one of his companies.  So, there was no issue of me going down.  Maybe that's some sort of veiled threat to me that I should be patient.

Q    Why was -- I get the sense from this e-mail that Mr. Mueller felt like his business was going down. What -- why would that be the case at this point in time?  In 2019?

A    Well, I don't know.  But it's evident here that he's struggling to pay off the Basha policy.  I'm assuming this is related to the Basha policy.

Q    And him trying to repay you or make his $800,000 payment that he had due to you on the Basha policy?

A    Well, I don't -- yes and no.  Yes.  His payment on the Basha policy.  But again, in this period

0146

of time, I don't know what the outstanding balance was. It certainly wouldn't be less than the 800, plus or minus, thousand dollars.  But it could have been more. I don't remember.

Q    So, the line in the same paragraph that begins but.  Do you see that?  But I am in the dark.

A    Yes.  I see it.

Q    So, Mr. Mueller wrote, but I am in the dark as to your agreement with your lender as that lender, and then in parentheses, nor your terms with him, end parentheses, was not a party to our contract.  So, I am at a loss as to how to respond to his sudden acceleration of the loan, why it was collateralized on your home, rather than the policy, or how that is tied to our agreement for the Basha policy.  Can you explain what is going on here?

A    Sure.  There was no lender and there was no loan on my home.  But that was my effort to try to get Robert to focus on paying off the outstanding balance. Because just paying his obligation wasn't important to him.  So, I took a stab at trying to appeal to his human side, to tell him that I could lose my home.  I had an investor that was applying pressure to me.  To see if I could tap into something that would help him -- help

motivate him to pay off his outstanding balance.

0147

Q    So, you lied to Mr. Mueller about the existence of a loan, it being collateralized on your home?

A    I did.

Q    Did you lie to him on other occasions as well?

A    Not that I can remember.  I was in a pretty aggravated state at this point.

Q    Mr. Mueller then --

A    Let me --

EXAMINATION BY MR. SCHULTZ:

Q    Mr. Andrew, did you ever, at this point, consider just saying forget it.  I'm going to write off the $800,000 or I'll sue him or do something else?

A    I considered suing him for it.  But Robert had a way of making people believe that he was honest with his words and intentions.  And clearly, I reached a point where I no longer believed that.  But there was a -- quite a long period of time when he would make promises to me and I believed him.  So, I held off with action.  Because I was just hopeful that we could resolve it.  Robert would ebb and flow when it came to ordering me to buy policies.  So, I was hopeful that it would flow again.  And he would have money to pay his obligation.

0148

Q    You used a term there.  He would ebb and flow on ordering me to buy policies.

A    Sure.

Q    What do you mean by that?  Ordering you to buy policies?

A    I was a supplier.  He would contact me and say, Tom, I need policies.  Go buy me policies.  I need X-million in face.  Or I need -- whatever.  He would tell me.  Go fill the order.  And sometimes he would pay for those policies immediately.  And that would give me hope that that type of behavior would continue.

Q    Okay.

EXAMINATION BY MR. BERELOVICH:

Q    Mr. Andrew, are you and Mr. Mueller still in contact?

A    No, we're not.

Q    Did you have any contact with him after that phone conversation you testified to earlier where you explained to him the sale price of the Basha policy?

A    My recollection is that was the last contact I had with him.

Q    So, you have no continuing professional or personal relationship with him?

A    I never had a personal relationship with him.  And I do not have a continuing professional

0149

relationship with him.

Q    What, if anything, do you know about the performance of the funds that Mr. Mueller operates today?

A    I don't know anything about their performance.

Q    Do you still have a professional relationship with Mr. Hagan?

A    I do.

Q    Are you still selling Mr. Hagan life policies?

A    I am.  There was an interruption in that last year for five or six months.  But I am selling policies to him again.

Q    What was the interruption caused by?

A    He was -- he told me that he was restructuring his fund and that until he had everything in order, he wasn't going to continue to buy policies.

Q    So, like Mr. Mueller, Mr. Hagan similarly buys policies for funds that he operates?

A    That's my understanding.  I don't know exactly how his fund is structured.  Again, I'm a supplier.  So, he gives me an order and I fill it.

Q    Mr. Andrew, is there anything that we didn't ask you about today that we should have?

A    Hmm.  Not that I can think of.

0150

Q    Is there anything else you would like to tell us?

A    No, I don't think so.

Q    Aside from Mr. Mueller, who else should we speak to in order to learn more about the matters that we've discussed today?

A    Well.  I would imagine that his internal staff, Nate and Scott, would know a lot more about the internal workings.

Q    Anyone else?

A    I'm not sure that his brother, Cary, would know as much as Nate and Scott.  Because he wasn't there for a very long time.

Q    Did you have the impression that Mister -- that Cary Mueller was intimately involved in the business.

A    He was.  He was.  But then he had a falling out with his brother.  And he left the company.  And that's when he hired Nate and Scott.

Q    What was -- what makes you say that he was heavily involved in the business?

A    I think I made two visits to Texas on Robert's invitation.  On one of those visits, his brother Cary was running the sales department.  And Cary was a very energetic, friendly, likeable, charismatic guy.  And he was in charge of his sales, from what I

0151

understood.

Q    And when you say sales -- I'm sorry, I didn't mean to cut you off.

A    Sales.  Finding agents or advisors to bring

This is to certify that I, Christine Boyce, (the undersigned) do hereby certify that the foregoing transcript is a complete, true and accurate transcription of all matters contained on the recorded proceedings of the investigative testimony.

_____   5-28-2021

0154

REPORTER'S CERTIFICATE

I, Eric Leichter, reporter, hereby certify that the foregoing transcript is a complete, true and accurate transcript of the testimony indicated, held on 5-27-21, at Washington, D.C., in the matter of: DEEPROOT 575 FUND, LLC

I further certify that this proceeding was recorded by me, and that the foregoing transcript has been prepared under my direction.

5-28-2021