**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v** | |
| **(1) ROBERT JEFFREY MUELLER** | **CRIMINAL NO. SA 24 CR 563 XR** |

GOVERNMENT'S RESPONSE TO
DEFENDANT'S MOTION *IN LIMINE* [DOCUMENT 61]

TO THE HONORABLE XAVIER RODRIGUEZ, UNITED STATES DISTRICT JUDGE:

The United States responds to Defendant's Motion *In Limine* as follows:

A.  **Evidence Regarding Statements Not Attributable to Mr. Mueller**

Defendant moves to exclude statements made by finders to investors as irrelevant. (Def.

Mot. 6). However, these statements made by finders to investors in this case originate from

statements written, made, or promulgated by Defendant about deeproot and its investment funds.

Statements written by the Defendant, include but are not limited to PowerPoint Presentations

(*e.g.* Exhibits A&B), Private Placement Memoranda ("PPM", *e.g.* Exhibit C), and newsletters

(*e.g.* Exhibit D).  Further statements made by Defendant to deeproot employees (Nate Spradlin,

Scott Allen, and/or Eric Dandridge), who all reported directly to Defendant and whose job was to

bring in investors, were passed to finders by the employees. The deeproot employees, and at time

the Defendant himself, provided these written and oral statements directly to various finders

(Greg Minear, Darryl Stein[1], Mark Zabinski, Jonmark Richardson, David Burke, and Paula

Burke) and victim investors. Defendant encouraged deeproot employees to cold call finders who

---

[1] Erroneously referred to in Defendant's Motion as "Darryl Fields", a retired employee of the U.S. Attorney's Office.

could pass information to their clients and provide introductions between their clients and deeproot employees. Victim investors relied on misrepresentations made by both the finders and the deeproot employees, both of whom gained their knowledge of the funds from Defendant's statements.

Defendant chose the model by which victim investors would be recruited (through finders), hired employees to reach out to finders, and created all written materials provided to finders and investors alike. The pattern jury instructions provide, "To 'cause' interstate or foreign wire communications facilities to be used is to do an act with knowledge that the use of the wire communications facilities will follow in the ordinary course of business or where such use can reasonably be foreseen." *See* Pattern Crim. Jury Instr. 5th Cir. 2.57 (Wire Fraud). Here, it was in the ordinary course of business and reasonably foreseeable to Defendant that promulgating his statements and omissions to employees and finders alike would cause interstate wire communications facilities to be used. This means, Defendant does not have to make the statements himself to induce wire transfers, it simply had to be reasonably foreseeable that investors would be given the very information he provided to employees and finders to secure the investment.

As a separate matter, it is important to note that most statements made by finders to investors are not hearsay. Most statements made by the finders and offered by the Government are not offered for the truth of the matter asserted, but rather, offered to show that the statements are false, or misrepresentations.

The statements made by finders to investors are relevant and admissible and Defendant's motion should be denied.

**B.** **Statements to Investors That Are Not Relevant to the Alleged Scheme to Defraud**

In this portion of the Motion *In Limine* Defendant is narrowly construing what the Superseding Indictment alleges.  Incorporating its introduction, the Superseding Indictment alleges a scheme to defraud and to obtain money by means of false and fraudulent pretenses, representations and promises, through the actions set forth in the "Manner and Means" portion. That includes false representations regarding the "financial condition of the deeproot family of companies".  Defendant seeks to exclude "[a]ny evidence of allegedly false or misleading statements other than those listed in [the other paragraphs of] the indictment.  Evidence of sources and uses of money are highly relevant to the "financial condition of the deeproot family of companies" and the alleged scheme to defraud and should therefore be admitted.[2]

The non-exhaustive list of affirmative misrepresentations include statements that investor money was being used to invest primarily in life settlement policies; that there were cash reserves; that there was no debt or leveraging of assets; that, depending on the timing, Pinball had or would shortly launch; that Pinball had generated over $1 million in revenues; that payments to investors would come from policy maturities and related company revenues; that delays in payments to investors were because Wells Fargo had a glitch or because deeproot had changed custodian; and that the SEC investigation was routine and nothing to worry about.

The non-exhaustive list of material omissions include that no life settlements were purchased by deeproot after May 17, 2017; that deeproot experienced substantial cash-flow shortages; that deeproot leveraged the Basha policy to obtain a $1,080,000 loan; that deeproot had lost ownership of the Basha policy due to non-payment of that loan and the remaining

---

[2] Believing the instant Motion was written prior to the United States' filing of its Motion *In Limine* Regarding Admissibility of Evidence (Document 52), the United States argues that the paragraph regarding Rule 404(b) on page 9 of the instant Motion is now mooted.

balance of the purchase price; that an asset worth nearly a third of the life insurance portfolio was lost; that investor money was the main source of money funding all operations of the various deeproot companies, to include payments owed to earlier investors; that Defendant used investor money to pay Defendant's personal credit cards and expenses; that Defendant received additional payment beyond his compensation; that deeproot had obtained PPP loans to both fund operations and to make payments owed to previous investors; and that deeproot pinball had a failed launch in September 2020.

### C.  Testimony of Tom Andrew

In this portion of the Motion, Defendant seeks the extraordinary remedy of barring in its entirety any and all testimony of Tom Andrew arguing that "there appears to be no appropriate subject for Mr. Andrew's testimony."  Defendant is mistaken. Tom Andrew was the principal of Cycladic, the sole supplier of life settlement policies to the deeproot family of companies. Those life settlement policies are the supposed principal investment in the fraud scheme.

First, as the Superseding Indictment alleges as part of the manner and means by which the scheme was executed, deeproot did not buy any life settlement policies after May 17, 2017. As the seller of policies on and before that date, Mr. Andrew's testimony is most relevant to understanding the true status of deeproot's investments, deeproot's debt, and the misrepresentations promulgated by the Defendant.  Contrary to the instant Motion's argument, the fact that Tom Andrew extended a $1,080,000 loan to deeproot in November 2018 using the Basha policy[3] as collateral is highly relevant to the fact that Defendant authored and authorized PowerPoints in 2020 falsely stating that there was "No External Debt or Leveraging against Assets" (Exhibit A, p. 4/27) and a "Track Record" of over 8 years which included "No external

---

[3] Purchased on May 16, 2017, making it by a day the second to last policy obtained by deeproot, not the last policy as stated in the Defendant's Motion.

leveraging or debt on assets" (*Id.*, p. 7/27). This cuts to the heart of misrepresentations that investors relied on when giving deeproot their money.

Further, the Defendant's Motion incorrectly claims that the United States has "abandoned" claims relating to the return of the Basha policy by deeproot to Cycladic on April 8, 2019.  This too goes to the heart of deeproot's financial condition, misrepresentations Defendant was causing to be made to finders and investors, and indeed his intent.  It is significant that the Grand Jury alleged that the scheme began "at a time unknown to the Grand Jury but believed to be *no later than* April 8, 2019" which is the day that ownership of the $9 million death benefit Basha policy reverted from deeproot to Cycladic, reducing the death benefit of the portfolio by nearly a third.  Mr. Andrew's testimony will show the Defendant had gone to great lengths to prevent Mr. Andrew from taking the policy back.  The correspondence between them shows Defendant's intent to keep victim investors in the dark as to deeproot's financial condition.  On April 5, 2019, four days before the surrender of the Basha policy, Defendant wrote in an email to Mr. Andrew

> Under the PPM, we have to notify investors is [sic] a 'default' of any kind of underlying asset.  However, it is a grey area whether a breach of contract with a remedy is equal to a default that we would need to notify investors about.  I look forward to reading the language carefully to avoid at all costs having a duty to inform investors; which would be the end of the business.

(Exhibit E).

Rather than notify investors of the default or modify statements to prospective investors subsequent to the default, Defendant relentlessly continued recruiting new investor money to the tune of  $31,308,478.90 between April 8, 2019, and August 10, 2021.  These subsequent victim investors had every right to know that deeproot had borrowed against a policy and had lost ownership of that policy.  It was material, and Defendant knowingly caused it to be hidden from

them.  Thus, Tom Andrew's testimony and the documentary evidence connected to it is most relevant to the charges in the Superseding Indictment.  This portion of the instant Motion should therefore be denied.

### D.  **Evidence Regarding the Impact of Lost Investments**

The United States is entitled to present evidence to give appropriate context to the jurors. In this particular case, context includes facts of how the victim investor obtained the money he/she invested in deeproot, what portion of his/her net savings was invested in deeproot,  and what portion of the investment was lost.

### E.  **Use of the Terms "Victim" or "Victim Investors"**

The United States using the terms "Victim" or "Victim Investors" is not unfairly prejudicial. As Defendant notes, the Superseding Indictment refers to the group of individuals who lost their money after investing in deeproot as "Victims" or "Victim Investors." The Grand Jury determined that there is sufficient probable cause to refer to this group of people as "Victims" or "Victim Investors" in the scope of Defendant's scheme. This group of approximately 120 people are numerable though only five are listed in the Superseding Indictment.

Defendant argues that using these terms requires that a crime was committed, that they are crime victims.  However, the legal definition of a crime "victim" is more expansive than the way the United States used the terms in the Superseding Indictment, referring only to those who invested funds.  *See* 18 U.S.C. § 3771(e)(2)(A). The definition proscribed by federal statute, "a person directly or proximately harmed as a result of the commission of a federal offense," encompasses more than merely those that invested in the fund. *Id*. This definition of a crime victim includes the finders, who were harmed by Defendant's crimes despite not necessarily

investing their own money. Many finders did not invest their own money but suffered irreparable reputational harm in their industries when deeproot stopped operating and were forced to pay large sums to the bankruptcy trustee for the finder's fees Defendant paid them during his scheme. Although the United States could have used this more expansive legal definition of crime "victim", it opted to use the practical, plain meaning definition.

Although Defendant jumps to a conclusion that a crime must have been committed if this group is referred to as "Victim Investors," common sense does not support that conclusion when looking at the plain meaning. People across the globe are victims of natural disasters, lawful military action, market crashes, or unfair circumstances – none of which involve criminal offenses. Here, the fact that this group of "Victim Investors" lost money they invested in deeproot without hope of recovering it - that is what makes them "Victims" and "Victim Investors," not whether a crime was committed or whether Defendant committed it.

Although we contest that any prejudice would be unfair in using the terms, to mitigate the concern expressed in the Defendant's Motion, the United States requests as part of its proposed jury instructions (Document 54) that the Court instruct the jury near the start of the trial that "Statements, arguments, and questions by lawyers are not evidence."[4]

### F.  Use of the Terms "Ponzi" or "Ponzi-like"

Defendant asks that the Court "limit the use of the term "Ponzi scheme" and preclude use of "Ponzi like payments" stating that there "are varying definitions as to the type of arrangements that could constitute a 'Ponzi' scheme, but a commonly identified characteristic is the lack of spending on operations of the company."  A more commonly identified characteristic is the use of new investor money to pay the principal and interest/dividends of prior investors as

---

[4] Pattern Crim. Jury Instr. 5th Cir. 1.01 (2024).

alleged in the Superseding Indictment, that is, "Ponzi like payments" which refutes Defendant's argument that the evidence does not support a finding that Defendant operated a Ponzi scheme. *See, e.g., United States v. Freeman*, 434 F. 3d 369, 373 (5th Cir. 2005) (defendant "told investors they would receive a higher-than-market rate of return and that their principal would remain safe, exposed to little or no risk, and would be returned on the expiration of the investment returns. * * * The funds, however, were never invested as promised, but instead were used for personal enrichment and to make 'lulling payments' to prior investors to make them believe that their initial investments were profitable.")

But to be clear, "Ponzi" is not a prescribed crime; it is a term of art.  The charged crime is Title 18, United States Code, Section 1343, which the United States intends to refer to as "wire fraud" and as applied to this case "wire fraud scheme".  However, the term "Ponzi" is relevant to the evidence in this case.  As noted in the Defendant's Motion, the evidence will show that one of deeproot's employees resigned on October 7, 2020, the day after Count One and prior to the remaining counts, writing to Defendant in a resignation memorandum "…in functional operation [deeproot] looks and feels like a Ponzi scheme, and I cannot and will not be a part of it." (Exhibit F.)  However, he was not the only one to use the term "Ponzi".  Earlier in 2020, Defendant promulgated a document styled "deeproot Family of Companies Investment Portfolio Narrative 2020.B2" heavily discussing the pinball project.  In setting forth the pinball project's necessity for deeproot, Defendant wrote that the downfall of other companies investing in life policies "wasn't really because of the life policies themselves. It instead was due to the company's CHOICE of how to deal with the weaknesses. In nearly every case, the company chose to LEVERAGE (i.e. either borrow capital at high rates on the open marketing [sic], or **ponzi-scheme proceeds**) against the future maturities."  (Exhibit G, p. 6, CAPS in the original,

**bold** added.)  The Defendant's own use of the word, in the context of leveraging the Basha policy two years prior and the persistent use of subsequent investor capital to pay the earlier investors shows his intent in committing the wire fraud scheme.  The evidence, including Defendant's own statements, use the terms "Ponzi" and "Ponzi-like".  Thus, to ensure jurors understand what the evidence before them means, the parties must be allowed to discuss those terms and their meaning.

### G.  Evidence Regarding Deeproot Payments to Mr. Mueller

Here, Defendant seeks to exclude evidence that Defendant continued to draw a salary and other payments, and what he spent them on.  Such evidence is highly relevant to Defendant's intent, particularly his motive to keep seeking new investor money rather than allowing the deeproot Family of Companies to fail as its policy maturities and operating revenues were never sufficient to keep them operating.  This evidence is both relevant and admissible under Evidence Rules 401 and 402.  It is not unduly prejudicial.  Sources and uses of funds are particularly relevant for the reasons previously discussed.

### H.  Limitations on Deposition Testimony of Mr. Mueller

Other than his refusal to answer questions asserting his Fifth Amendment rights, there should be no constraints on the United States' use of Defendant's deposition testimony.  His statements in the depositions pertain to the very subject matter of this trial and are non-hearsay admissions of a party opponent under Evidence Rule 801(d)(2)(A).  Defendant cites Rule 106 and *United States v. Herman*, 997 F.3d 251, 263-64 (5th Cir. 2021) for the proposition that he should be allowed to present "any appropriate excerpts to be played at the same time as the Government's excerpts under the rule of completeness."  However *Herman* does not stand for that proposition.  To the contrary, in that case, "the Government provided the [defendants] with

16 audio clips it intended to play at trial totaling about 25 minutes of recorded conversations between the [defendants] and [a government agent.] In response, the [defendants] provided the Government with 18 supplemental audio clips totaling an additional 43 minutes of conversation pulled from the same set of recordings." *Id.*, at 261-62.  Relying on Rule 106[5], the defendants argued that "their proffered clips provided necessary context for the jury, arguing that the Government had cherry-picked recordings of their incriminating statements but left out clips in which they made contradictory statements or clips in which [the government agents] prompted them to make the incriminating statements." *Id.*, at 262.  There, as the United States does here, the "Government objected to the supplemental recordings as inadmissible hearsay, arguing that the [defendants] were attempting to use their own out-of-court statements to establish certain facts and mitigate other damaging admissions without testifying at trial." *Id.*  Although the district court allowed some clips, it excluded others.  Defendants appealed.  The Fifth Circuit first noted that "[n]either the Constitution nor Rule 106 ... requires the admission of the entire statement once any portion is admitted in a criminal prosecution. Nor does applying Rule 106 require[ ] that a defendant demonstrate with particularity the unfairness in the selective admission of his ... statement[s] violate a defendant's constitutional rights." *Id.*, at 263 (internal quotations and citations omitted.)  The court went on to hold that:

> Rule 106 requires the introduction of a writing or recorded statement only when the omitted portion is necessary to qualify, explain, or place into context the portion already introduced, and we analyze each of the excluded defense exhibits under this standard. While Rule 106 encourages completeness in writings or recordings, it restricts a requirement of completeness by the qualification that the portion sought to be admitted must be relevant to the issues, and only the parts which qualify or explain the subject matter of the portion offered by the opponent need be admitted. Rule 106 permits a party to correct an incomplete and misleading impression created by the introduction of part of a writing or recorded

---

[5] "Remainder of or Related Statements.  If a party introduces all or part of a statement, an adverse party may require the introduction, at that time, of any other part--or any other statement--that in fairness ought to be considered at the same time. The adverse party may do so over a hearsay objection."

statement; it **does not permit a party to introduce writings or recorded statements to affirmatively advance their own, alternative theory of the case.**

*Id.*, at 264 (internal quotations and citations omitted, emphasis added). In line with the Fifth Circuit holding in Herman, it should be a case-by-case evaluation of whether additional clips proposed by the Defendant are required to qualify, explain, or place into context the portion introduced by the Government.

## I.    No Expert or Opinion Testimony

The United States does not intend to present expert testimony.  To the extent any lay witnesses offer opinion testimony as to their understanding and interpretation of the evidence that they either heard or saw, such is admissible under Fed. R. Evid. Rule 701.  Unlike Rule 702 expert testimony, there are no notice or discovery provisions regarding Rule 701 lay opinion testimony.

A lay witness may offer opinion testimony so long as it is "rationally based on the witnesses' perceptions." Fed. R. Evid. 701(a).  "Rationally based" entails that the lay opinion be based on the witnesses' personal knowledge. *United States v. Lopez*, 762 F.3d 852, 864 (9th Cir. 2014).  Personal knowledge upon which a lay witness' testimony rests may be gained during the witness' investigation. *United States v. Gadson*, 765 F.3d 1189, 1206-07 (9th Cir. 2014).  The Fifth Circuit has generally allowed lay witness testimony to assist the trier of fact with understanding evidence. *United States v. Washington*, 44 F.3d 1271, 1283 (5th Cir.). *See also United States v. Fuller*, 974 F.2d 1474, 1482-83 (5th Cir.1992) (law enforcement officers were allowed to testify to the coded language used in drug money laundering).  In *United States v. Griffith*, 118 F.3d 318 (5th Cir. 1997), the Fifth Circuit upheld the admission of a DEA Agent's lay testimony concerning the interpretation of drug dealers "cryptic slang." *Id*. at 321. The court noted the purpose of cryptic language is to "conceal, through deliberate obscurity, the illegal nature

of the activities being discussed," and without expert assistance, it is implausible to expect jurors and even judges to fully comprehend the meaning. *Id.*

Similarly, in *United States v. Freeman*, 498 F.3d 893 (9th Cir. 2007), the Ninth Circuit upheld the admission of the case agent's lay testimony regarding coded communications based on the agent's knowledge of the investigation:

> The record reveals that the majority of [case agent] Shin's lay testimony consisted of his interpretations of ambiguous conversations based upon his direct knowledge of the investigation. Although [case agent] Shin was not a participant in the conversations he interpreted, his understanding of ambiguous phrases was based on his direct perception of several hours of intercepted conversations – in some instances coupled with direct observations of [defendants] Mitchell and Brown – and other facts he learned during the investigation . . . Such testimony also proved helpful to the jury in determining what [defendants] Freeman, Mitchell, and Brown were communicating during the recorded telephone calls . . . [case agent] Shin's interpretation of ambiguous statements was permissible under Fed. R. Evid. 701.

*Id.* at 904-05.

Here, the United States intends to elicit lay opinion testimony from both fact witnesses and the FBI forensic analyst summary witness. The witnesses will base any opinions on what they saw or were told. The FBI forensic analyst summary witness will base any opinions on what was written on the voluminous records – primarily bank records – underlying his Rule 1006[6] summaries.

**J.   No allegations, Orders, or Agreements from the SEC Case or Adversary Case**

The United States does not anticipate introducing extrinsic evidence of the orders or agreements from the SEC case. However, the United States does anticipate introducing evidence of Defendant's knowledge of the SEC investigation into deeproot as it is both relevant and

---

[6] F.R. Evid. Rule 1006(a) states "The court may admit as evidence a summary, chart, or calculation offered to prove the content of voluminous admissible writings, recordings, or photographs that cannot be conveniently examined in court, whether or not they have been introduced into evidence."

admissible.  The fact that Defendant persisted in soliciting new investor money while aware of the SEC's investigation is evidence of his intent and should be allowed.  *See United States v. Anderson*, 558 F. App'x 454, 462 (5th Cir. 2014) (Order from the Maryland securities Board cease and desist order ruled admissible: "Given this evidence, the probative value of the Order was not substantially outweighed by unfair prejudice or any other Rule 403 dangers. The district court did not err in admitting the Order.")  Thus, this portion of the Motion should be denied.

Respectfully submitted,

JUSTIN R. SIMMONS
UNITED STATES ATTORNEY


_____

WILLIAM R. HARRIS
Assistant United States Attorney
Ohio State Bar No. 0017818
601 N.W. Loop 410, Suite 600
San Antonio, Texas 78216-5597
(210) 384-7100
Bill.harris@usdoj.gov


_____/s/_____
ALICIA McNAB
Assistant United States Attorney
Texas State Bar No. 24103867
601 NW Loop 410, Suite 600
San Antonio, Texas 78216
Alicia.mcnab@usdoj.gov

## **CERTIFICATE OF SERVICE**

I hereby certify that on the 9th day of April, 2026, a true and correct copy of the foregoing instrument was electronically filed with the Clerk of the Court using the CM/ECF System which will transmit notification of such filing to the Counsel of Record in this matter:

H. Jay Hulings

WILLIAM R. HARRIS
Assistant U.S. Attorney