**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | |
| **v.** | § | **SA-24-CR-563-XR** |
| | § | |
| **ROBERT JEFFREY MUELLER** | § | |
| | § | |

**<u>ORDER</u>**

**BACKGROUND**

**I.      Indictments**

On November 6, 2024, the Defendant, Robert Jeffrey Mueller, was charged in an Original Indictment with eight counts of wire fraud.  Dkt. No. 1.  On March 18, 2026, a Superseding Indictment (Dkt. No. 39) was filed that charges Mueller with five counts of wire fraud under 18 U.S.C. § 1343.

**II.      Defendant's Background and the deeproot Enterprise**

Mueller was a licensed attorney, at times a licensed insurance agent, and the founder and principal of the deeproot family of companies. The deeproot family consisted of related LLCs and S corporations including Policy Services, Inc., deeproot Capital Management, LLC, and deeproot Funds, LLC, with deeproot Funds serving as ultimate parent of the deeproot Growth Runs Deep Fund, LLC and the deeproot 575 Fund, LLC.  Dkt. Nos. 39 and 61.

The Government alleges that the 575 Fund was promoted as a profit-generating investment vehicle investing primarily in life settlements. Investors were offered either monthly payments at 5% simple annual interest or deferred income at 7% over five years—thus the name "575." Each investor was required to sign a Subscription Agreement and Private Placement Memorandum (PPM) before deeproot accepted any investment.

1

**III.    The Alleged Scheme to Defraud (April 8, 2019 – August 10, 2021)**

The Government alleges a scheme began "at a time unknown to the Grand Jury but believed to be no later than April 8, 2019," the day ownership of the $9 million Basha policy reverted from deeproot to Cycladic (Tom Andrew's company), reducing the death benefit of the portfolio by nearly a third. No life settlement policies were purchased by deeproot after May 17, 2017. In November 2018, Andrew had extended a $1,080,000 loan to deeproot using the Basha policy as collateral, allegedly contradicting Mueller's promotional statements of "No External Debt or Leveraging against Assets."

Four days before the Basha surrender, on April 5, 2019, Mueller wrote to Andrew: "Under the PPM, we have to notify investors is [sic] a 'default' of any kind of underlying asset. However, it is a grey area whether a breach of contract with a remedy is equal to a default that we would need to notify investors about. I look forward to reading the language carefully to avoid at all costs having a duty to inform investors; which would be the end of the business." Rather than notify investors, Mueller continued raising new investor money totaling $31,308,478.90 between April 8, 2019, and August 10, 2021.[1]

**IV.    Specific Manner and Means Charged**

The Superseding Indictment alleges Mueller:

- Solicited and caused others to solicit investments in the 575 Fund.

- Falsely represented that "the simple majority of our Fund Assets" would be used to invest primarily in "Life Policies."

---

[1] Mueller appears to assert that he had little to no interaction with investors and that if any of the deeproot "finders" made misrepresentations, he did not approve or direct those statements. He also seems to assert that the deeproot investment strategy was shifted to include pinball machine manufacturing and that was disclosed to investors in PPMs.

• Falsely represented that income to investors would come from fund revenues. In truth, payments came from subsequent investors and other non-revenue sources.

• Falsely represented the "financial condition of the deeproot family of companies."

• Omitted that no life settlements were purchased after May 17, 2017.

• Omitted that a significant portion of new investor funds were used to repay earlier investors.

## PENDING MOTIONS

Trial in this case is set for August 17, 2026. The Government and the Defendant have filed motions *in limine*, and Mueller has also filed a motion for Bill of Particulars. Dkt Nos. 52, 60, and 61.

## I.    Government's Motion in Limine (Dkt. No. 52)

In this motion the Government seeks a ruling that evidence that Mueller obtained four PPP loans during the Covid pandemic is relevant and admissible in this wire fraud case. The Government contends that Mueller obtained four PPP loans during the indictment timeframe. Bank records show he used the November 30, 2020 ($411,923.25) and February 2, 2021 ($112,948) loans to pay deeproot investors—rather than for certified payroll/rent purposes. During this same period, Mueller continued directing employees to tell investors deeproot was "debt free." The Court finds that evidence of the PPP loans is intrinsic to the wire fraud allegations. "To determine whether evidence is intrinsic, courts consider whether the evidence is 'inextricably intertwined' with the crime charged, whether there was a 'single criminal episode,' or whether the other acts were 'necessary preliminaries' to the crime charged." *United States v. Williams*, 712 F. App'x 376, 380 (5th Cir. 2017). Defendant's Fed. R. Evid. 403 and any other challenges are overruled. The Government's motion is **GRANTED**.

## II.    Defendant's Motion for Particulars (Dkt. No. 60)

3

Mueller argues that the latest Indictment "replaced several of the alleged misrepresentations and omissions in the Original Indictment with a new, broadly worded catch-all designation that Mr. Mueller falsely represented the 'financial condition' of the Deeproot companies." As a result he argues that the Government should be directed to identify with particularity what aspects of deeproot's financial condition Mueller misrepresented.

Generally, a "bill of particulars is designed 'to apprise the defendant of the charge against him with sufficient precision to enable him to prepare his defense.' But '[i]t is not designed to compel the government to detailed exposition of its evidence or to explain the legal theories upon which it intends to rely at trial.'" *United States v. Davis*, 53 F.4th 833, 845 (5th Cir. 2022).

However, when "the charges in an indictment 'are so general that they do not advise a defendant of the specific acts of which he is accused,' it is within the trial court's discretion to grant a bill of particulars . . . ." *United States v. Harris*, No. EP-13-CR-1285-PRM, 2014 WL 2112112, at *2 (W.D. Tex. Mar. 14, 2014). While the Superseding Indictment is constitutionally sufficient, the Court believes that it is too general to satisfactorily apprise Defendant of the charges against him. Specifically it fails to apprise the Defendant of what aspects of deeproot's financial condition Mueller misrepresented. The Government has satisfied its obligation of notifying the Defendant that Mueller: (1) directed employees to tell investors deeproot was "debt free" when in fact it owed PPP loans; (2) falsely represented that "the simple majority of our Fund Assets" would be used to invest primarily in "Life Policies"; (3) falsely represented that income to investors would come from fund revenues when payments came from subsequent investors and other non-revenue sources; (4) omitted that no life settlements were purchased after May 17, 2017; and (5) omitted that a significant portion of new investor funds was used to repay earlier investors.

Further, in its Response to Mueller's motion, the Government identified "non-exhaustive" lists of additional alleged misrepresentations and omissions, including: claims that there were cash reserves; no debt or leveraging; pinball had launched or generated $1 million in revenues; and payments would come from policy maturities. Alleged omissions extended to: deeproot's substantial cash-flow shortages; the $1.08 million loan against the Basha policy; loss of the Basha policy; investor money funding all operations; Mueller's personal use of investor funds; PPP loans funding operations and investor payments; and the "failed launch" of pinball in September 2020.

Despite its many clear articulations of the alleged misrepresentations and omissions, the Government insists on keeping a catch-all statement that Mueller falsely represented the "financial condition" of the Deeproot companies. That fails to adequately apprise the Defendant so that he may prepare his defense. Defendant's motion is **GRANTED**.

### III.    Defendant's Motion *In Limine* (Dkt. No. 61)

Defendant seeks to exclude the following from the jury's presence:

### A.  Evidence of Statements Not Attributable to Mueller

Defendant argues that of the five investors named in the Superseding Indictment, only one actually spoke with Mueller about the potential investment, another had "fleeting, non-substantive contact," and the other three had no contact with him at all. Most investors reached deeproot through "finders"—independent advisors who signed contracts directing them not to discuss the deeproot business with potential investors and to leave substantive descriptions to deeproot staff and pre-approved documents. Mueller contends some finders "went rogue" and gave investors incorrect information—that deeproot was "an annuity," "totally insured," or only invested in insurance policies—claims never made, approved, or known by Mueller. He argues that the Government must prove he made or directed others to make false representations with intent to defraud, not that finders committed unsupervised malfeasance.

5

Defendant also argues that without a clear link showing that he directed, approved, or was aware of finder statements, such testimony is irrelevant under Rule 401 and cannot support a finding of a scheme to defraud.  Alternatively, he seeks preclusion under Fed. R. Evid. 403.

The Government argues that the finder statements originated from materials Mueller wrote, made, or promulgated—PPMs, PowerPoints, newsletters—passed to finders by deeproot employees who reported directly to Mueller (Spradlin, Allen, Dandridge).

"A defendant need not personally have made the communication on which the wire-fraud count is based . . . ."  *United States v. Forkner*, 584 F. Supp. 3d 180, 189 (N.D. Tex. 2022). Statements that traceably derive from Mueller-authored statements or materials or from employees reporting to him are admissible as reasonably foreseeable consequences of the scheme. The Government should not, however, parade unattributed "rogue" statements (e.g., a finder calling the product "an annuity" without any ascription to Mueller) to establish elements of fraud where there is no record link to Mueller's instructions or materials.  This point is **GRANTED IN PART** and **DENIED IN PART**.

### B. Evidence of Statements to Investors Not Relevant to the Manner and Means Alleged in the Superseding Indictment

Misrepresentations and omissions bearing on financial condition—the Basha loan and loss, cash-flow shortages, source of funds for investor payments, the role of PPP loans—fall within the pleaded theory and are admissible. However, attenuated categories (Wells Fargo "glitch" excuses, custodian-change excuses, characterizations of the SEC investigation as "routine," and pinball's "failed launch") require the Government to make a proffer at trial showing how the above links to a specific charged manner and means.  This point is **GRANTED IN PART** and **DENIED IN PART**.

### C. Evidence from Thomas Andrew

Mueller contends that Andrew's testimony should be excluded because his interactions with deeproot ended before the alleged scheme began. Alternatively, he argues that any probative value is grossly outweighed by unfair prejudice from Andrew's own "brazen act of fraud." In the alternative, Mueller requests confirmation he may impeach Andrew on his admission of lying to Mueller and his motive to avoid prosecution.

The Government contends that Andrew was the principal of Cycladic, the sole supplier of life settlement policies to deeproot. Andrew's testimony establishes: (1) no life settlements were purchased after May 17, 2017; and (2) the $1,080,000 loan deeproot took against the Basha policy makes Mueller's "No External Debt" representations false. Further, the Government contends that an email exchange between Andrew and the Defendant in which Mueller said he would look "to avoid at all costs having a duty to inform investors; which would be the end of the business" is direct evidence of Defendant's fraudulent intent.

The Court finds that Andrew's testimony is probative on the existence of the alleged scheme—the Basha loan, the Basha loss on the indictment's start date, the absence of post-May 2017 life-settlement purchases, and Mueller's contemporaneous email expressing a goal of avoiding investor disclosure. The fact that Andrew's direct dealings with deeproot ended before the charged scheme period does not strip him of relevant historical knowledge that contextualizes the scheme's start.

Defendant, however, may cross-examine Andrew on any credibility, bias, and motive, subject to ordinary Rule 401 and 403 limits. This point is **GRANTED IN PART** and **DENIED IN PART**.

### D. Evidence of Impact on Investment Losses from Investors

The Defendant argues that since loss is not an element of wire fraud, testimony about "particular personal or professional impact" of losses risks the jury convicting "as a way of

compensating these victims without regard to evidence of [Defendant's] guilt." Dkt. No. 61 at 15 (citing *United States v. Copple*, 24 F.3d 535 (3d Cir. 1994)).

The Government contends that it is entitled to present contextual evidence including "how the victim investor obtained the money he/she invested in deeproot, what portion of his/her net savings were invested in deeproot, and what portion of the investment was lost." Mueller treats this as a partial concession—the Government's stated scope does not include personal hardship narratives—but reserves objection if the scope is exceeded.

Consistent with the Government's narrowed scope, contextual financial evidence (source of invested funds, percentage of net savings invested, amount lost) is admissible as background to the scheme. Personal-and-professional-impact testimony of the type addressed in *Copple* (lost homes, derailed retirements, family hardship) is excluded under Rule 403.

### E. Use of the Term "Victim"

 Relying upon *United States v. August*, 590 F. Supp. 3d 972 (W.D. Tex. 2022), the Defendant argues any use of the term "victim" by the Government presupposes a crime has been committed and improperly implies the Government has proven a core element. Mueller requests that the Government use the term "investors."  Applying Rule 403, the Court agrees and this point is **GRANTED**. *See United States v. Sena*, No. 19-CR-01432, 2021 WL 4129247, at *2 (D.N.M. Sept. 9, 2021).

### F. Use of the Term "Ponzi"

The Defendant argues that the Superseding Indictment does not allege a Ponzi scheme and that the term has no independent probative value but is inflammatory. Mueller acknowledges the term may surface through documentary evidence (e.g., the Allen resignation letter) but argues it should be excluded outside those specific contexts.

The Government responds that Mueller himself used the term in a 2020 document and a deeproot employee used it in his October 2020 resignation letter saying the company "looks and feels like a Ponzi scheme." Accordingly, the parties must be allowed to discuss these terms so jurors can understand the documentary evidence.

The Government may (1) introduce the documentary evidence in which the term appears (Mueller's own 2020 writing; the Allen resignation letter) without redaction, and (2) ask witnesses about the term as it appears in those documents. *See United States v. Plato*, 593 F. App'x 364, 375 (5th Cir. 2015) (noting that a Ponzi scheme is characterized by the "practice of paying old investors with new-investor money"). The Government should, however, restrict its use of the term to avoid undue prejudice. Fed. R. Evid. 403.

### G. Evidence of Mueller's Spending

PPMs disclosed Mueller would receive a salary "from the Ultimate Parent for all services provided across all the entities." It is alleged that his total payroll and non-payroll compensation was approximately $2–2.5 million over seven years (~$300,000–$400,000 annually). Non-payroll compensation included payments for jewelry, travel, and tuition for his daughter.

Mueller argues that the relevant fact is the amount he received, not what he did with it. He argues that specific personal expenditures (jewelry, travel, daughter's tuition) should be excluded under Rule 403. He offers to stipulate to the total amount of salary and personal expenses received.

The Government argues that this evidence is "highly relevant" to Mueller's intent — specifically his motive to keep seeking new investor money to fund his personal lifestyle rather than allowing the companies to fail when revenues were insufficient.

The evidence that Mueller received funds from deeproot is relevant to the wire fraud charges. How such monies were spent could also potentially be relevant to the Defendant's motive

9

and intent in continuing the alleged fraud.  *See United States v. Hoey*, 725 F. App'x 58, 61 (2d Cir. 2018); *United States v. Salzano*, No. 22CR690 (EP), 2024 WL 866885, at *10 (D.N.J. Feb. 26, 2024) ("[C]ourts routinely admit similar extravagant expenditure evidence. Courts have routinely found evidence of extravagant expenditures admissible as proof of motive.").  The motion on this issue is **DENIED**.  The Court, however, will limit the Government's argument and evidence during trial if Rule 403 balancing factors are later triggered.

### H.  Limitations on Mueller Deposition

Mueller seeks (1) advance notice of which deposition clips the Government intends to use and (2) the opportunity to identify excerpts under Rule 106. He clarifies he seeks only "any appropriate" clips and agrees to a case-by-case evaluation.

The Government argues that Mueller's deposition statements are non-hearsay admissions of a party opponent under Fed. R. Evid. Rule 801(d)(2)(A).  It also argues Rule 106 does not require admission of the entire statement, only portions necessary to "qualify, explain, or place into context"; the rule does not allow a defendant to advance an alternative theory without testifying.

Rule 106 "requires the introduction of a writing or recorded statement only when the omitted portion is 'necessary to qualify, explain, or place into context the portion already introduced ....'  [I]t does not permit a party to introduce writings or recorded statements to affirmatively advance their own, alternative theory of the case." *United States v. Carpenter*, 140 F.4th 733, 740 (5th Cir. 2025).

The motion on this issue is **GRANTED IN PART** and **DENIED IN PART**.  The Government must provide reasonable advance notice (e.g., 5 business days before trial) of intended deposition designations to permit the parties to confer on Rule 106 completeness designations and

to bring focused disputes to the Court before the testimony is offered. On the substantive Rule 106 question, the Court will rule on completeness designations on a clip-by-clip basis at trial— admitting only those additional excerpts necessary to qualify, explain, or contextualize the Government's designations.

## I. Expert Testimony

The Government has confirmed it will not call expert witnesses.  The Defendant, however, seeks to exclude the FBI summary witness from testifying on his/her interpretation of PPMs, characterizing expenses, or opining whether payments to Mueller were "permissible," arguing that becomes expert territory.

The Government states it intends only lay opinion testimony from fact witnesses and the FBI forensic analyst summary witness, as permitted under Rule 701 when "rationally based on the witness' perception."

"If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is: (a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702."  Fed. R. Evid. 701.

The FBI analyst may present lay testimony that summarizes payments and expenses. *United States v. Hamaker*, 455 F.3d 1316, 1332 (11th Cir. 2006).  Under Fed. R. Evid. 1006 and Rule 701, the forensic analyst may also testify to, and present summaries of, voluminous records based on what the records say, may describe payment flows, and may identify which accounts disbursed which funds.  The witness may not, however, opine that any payment was "permissible" or "impermissible," interpret legal documents (PPMs, Subscription Agreements, contracts) for the jury, or offer characterizations that depend on specialized knowledge. The line is between *what*

11

*the records show* (lay) and *what the records mean as a matter of contractual or legal compliance* (expert). The Government is ordered to confine the summary witness accordingly; if it intends interpretive testimony, expert notice under Rule 16 is required.  The motion on this issue is **GRANTED IN PART** and **DENIED IN PART**.

### J. Allegations, Orders, or Agreements from the SEC Case and Adversary Proceedings

Mueller was investigated by the U.S. Securities and Exchange Commission.  A civil lawsuit was later filed.  SA-21-CV-785-XR.  Mueller seeks exclusion of the complaint, pleadings, and orders under Rules 401 and 403.  *See also United States v. Cook*, 557 F.2d 1149, 1150 (5th Cir. 1977) (admission of consent injunction documents was error resulting in substantial prejudice).

The Government concedes that evidence of the SEC action should be excluded but argues that evidence of Mueller's *knowledge* of the SEC investigation is relevant to intent—his persistence in soliciting new investor money while aware of the investigation supports willfulness.

The motion on this issue is **GRANTED** to the extent that it seeks exclusion of (i) the SEC's pleadings, (ii) the Court's orders in the SEC Case, and (iii) any settlement documents to which Mueller agreed. *Cook* supports exclusion. The motion is **DENIED** to the extent it would bar all reference to the existence of the SEC investigation: Mueller's *knowledge* of the investigation, and his contemporaneous statements characterizing it (e.g., that it was "routine" or "nothing to worry about"), are relevant to consciousness of guilt and intent, consistent with *United States v. Anderson*, 558 F. App'x 454, 462 (5th Cir. 2014).

12

**CONCLUSION**

The Government's motion in limine (Dkt. No. 52) is **GRANTED**.  The Defendant's motion for Bill of Particulars (Dkt. No. 60) is **GRANTED** as detailed above.  The Defendant's motion in limine (Dkt. No. 61) is **GRANTED IN PART** and **DENIED IN PART** as detailed above.

The Government should respond to the Bill for Particulars within 14 days.

It is so **ORDERED**.

**SIGNED** this June 1, 2026.

_____

XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE