**FILED**

June 03, 2026

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS

BY: _____
MGR

DEPUTY

**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>**Plaintiff**<br><br>v<br><br>**ROBERT JEFFREY MUELLER**<br><br>**Defendant** | **CRIMINAL NO. SA-24-CR-563-XR**<br><br>**SECOND SUPERSEDING INDICTMENT**<br><br>**COUNTS 1- 5:  Wire Fraud, 18 U.S.C. § 1343;**<br>**COUNT 6: Bank Fraud, 18 U.S.C. § 1344** |

**THE GRAND JURY CHARGES**:

## **INTRODUCTION**

At all times relevant to this Indictment:

1. Defendant **ROBERT JEFFREY MUELLER ("MUELLER")**, a resident of San Antonio, Texas, was a licensed attorney at law, at times a licensed insurance agent, and the founder and principal of the deeproot family of companies.

2. The deeproot family of companies, variously referred to herein collectively as deeproot, consisted of several related limited liability companies and subchapter S corporations, including but not limited to Policy Services, Inc., a Texas S corporation; deeproot Capital Management, LLC, a Texas limited liability company; deeproot Funds, LLC, a Texas limited liability company, and deeproot Tech, LLC, a Texas limited liability company, each of which operated in San Antonio, Texas.

3.      deeproot Funds, LLC, was the "ultimate parent" of other Texas limited liability companies including but not limited to deeproot Growth Runs Deep Fund, LLC, and deeproot 575 Fund, LLC, referred to herein as the 575 Fund.

4.      deeproot's promotional materials stated that investors in the 575 Fund would invest for five years and either receive a monthly payment of 5% simple annual interest of their principal investment or defer receiving income for the five years at which time they would receive a 7% simple annual interest return on investment, hence the name "575".

5.      Both directly and through others, **MUELLER** promoted the 575 Fund as a profit-generating investment vehicle investing primarily in life settlements utilizing Private Placement Memoranda (herein PPMs), PowerPoint presentations, brochures, and other marketing materials. As described in the PPMs for the 575 Fund, the investment strategy involved a plan to purchase life insurance policies that insured the lives of people who were not affiliated with Defendant or any of his businesses and who had sold their policies for cash settlements while still alive. These were known as "life settlements."  By purchasing these policies, the 575 Fund would purportedly be entitled to the death benefit of the purchased policies upon the death of the insured. At all times, the PPMs stated that **MUELLER** and deeproot would invest a majority of the 575 Fund's assets in life settlement policies.

6.      **MUELLER** exercised nearly exclusive control of all deeproot financial institution accounts.

7.      The Victim Investors were individuals who invested in the 575 Fund.

**COUNTS ONE THROUGH FIVE**
**[18 U.S.C. § 1343]**

8.      The Introduction to this Indictment is incorporated herein as if fully restated.

2

9. Beginning at a time unknown to the Grand Jury but believed to be no later than April 8, 2019, in the Western District of Texas, the Defendant, **ROBERT JEFFREY MUELLER**, did unlawfully and knowingly devise and execute a scheme to defraud the Victim Investors, and to obtain from them money by means of false and fraudulent pretenses, representations and promises, through the actions set forth in the "Manner and Means" portion below.

## MANNER AND MEANS

10. The scheme to defraud was accomplished through the following manner and means:

11. **MUELLER** solicited and caused others to solicit investments in the 575 Fund from Victim Investors.

12. **MUELLER** falsely represented and caused others to represent to Victim Investors that "the simple majority of our Fund Assets" would be used by the 575 Fund to invest primarily in "Life Policies".  In truth and in fact, it was not used for that purpose

13. **MUELLER** falsely represented and caused others to represent to Victim Investors that income to the investors in the 575 Fund would come from fund revenues, including life settlement maturities and operating profits from the related businesses in the deeproot family of companies. In truth and in fact, payments made to these investors came from the investments of subsequent investors and other non-revenue sources

14. **MUELLER** falsely represented and caused others to represent to Victim Investors the financial condition of the deeproot family of companies to Victim Investors.

15. **MUELLER** made and caused others to make the following omissions of material fact among others:

    a) No life settlements policies were purchased by deeproot after May 17, 2017.

b)  A significant portion of funds being invested by new Victim Investors was being used to repay earlier investors their principal and interest.

THE EXECUTIONS OF THE SCHEME

16.    On or about the date stated below, for the Count listed below, in the Western District of Texas and elsewhere, the Defendant,

ROBERT JEFFREY MUELLER,

for the purpose of executing the scheme to defraud and to obtain money by means of false and fraudulent pretenses, representations and promises, transmitted and caused to be transmitted by wire in interstate and foreign commerce writings as set forth below.

| Count | Date | Victim Investor | Wired From | Wired To | Amount |
|---|---|---|---|---|---|
| One | 10/6/2020 | M.S. | Community National Bank, Kansas | Wells Fargo Bank, San Antonio, Texas | $100,000 |
| Two | 3/25/2021 | M.M. | TD Bank, New Jersey | Wells Fargo Bank, San Antonio, Texas | $250,000 |
| Three | 4/2/2021 | M.Z. | Community National Bank, Kansas | Wells Fargo Bank, San Antonio, Texas | $189,555.07 |
| Four | 6/11/2021 | B.L. | Community National Bank, Kansas | Wells Fargo Bank, San Antonio, Texas | $1,000,000 |
| Five | 6/11/2021 | J.K. | Community National Bank, Kansas | Wells Fargo Bank, San Antonio, Texas | $400,318.78 |

All in violation of Title 18, United States Code, Section 1343.

**COUNT 6**
**[18 U.S.C. § 1344]**

1.      Paragraphs 1, 2, and 6 of the Introduction to this Indictment are incorporated herein as if fully restated.

***The Small Business Administration***

1.      The United States Small Business Administration ("SBA") was an executive-branch agency of the United States government that provided support to entrepreneurs and small businesses.  The mission of the SBA was to maintain and strengthen the nation's economy by enabling the establishment and viability of small businesses and by assisting in the economic recovery of communities after disasters.

***The Paycheck Protection Program***

2.      The Coronavirus Aid, Relief, and Economic Security ("CARES") Act was a federal law enacted in or around March 2020 that was designed to provide emergency financial assistance to the millions of Americans who were suffering the economic effects caused by the COVID-19 pandemic.  One source of relief provided by the CARES Act was the authorization of up to $349 billion in forgivable loans to small businesses for job retention and certain other expenses, through a program referred to as the Paycheck Protection Program ("PPP").  In or around April 2020, Congress authorized over $300 billion in additional PPP funding.

3.      In order to obtain a PPP loan, a qualifying business was required to submit a PPP loan application signed by an authorized representative of the business.  The PPP loan application required the business (through its authorized representative) to acknowledge the program rules and make certain affirmative certifications in order to be eligible to obtain the PPP loan.  In the PPP loan application, the applicant (through its authorized representative) was required to state, among other things: (a) its average monthly payroll expenses; and (b) its number of employees.  These

figures were used to calculate the amount of money the small business was eligible to receive under the PPP.  In addition, the applicant was required to provide documentation showing its payroll expenses.

4.    A business's PPP loan application was received and processed, in the first instance, by a participating lender.  If a PPP loan application was approved, the participating lender funded the PPP loan using its own monies.  Data from the application, including information about the borrower, the total amount of the loan, and the listed number of employees, was transmitted by the lender to the SBA in the course of processing the loan.

5.    PPP loan proceeds were required to be used by the business on certain permissible expenses: payroll costs, interest on mortgages, rent, and covered operations expenditures.  The PPP allowed the interest and principal on the PPP loan to be entirely forgiven if the business spent a designated portion of the loan proceeds on these expense items within a designated period of time after receiving the proceeds and used a certain amount of the PPP loan proceeds on payroll expenses.

6.    Cross River Bank, headquartered in New Jersey, the deposits of which were insured by the Federal Deposit Insurance Corporation, participated in the PPP as a lender, and as such was eligible to lend funds to eligible borrowers under the terms of the PPP.

7.    On or about April 9, 2021, Defendant applied for a loan in the amount of $759,917, falsely promising to use the loan proceeds on permitted business expenses under the PPP, specifically "Payroll Costs", "Rent/Mortgage Interest", and "Covered Operations Expenditures".

8.    On or about April 9, 2021, Defendant executed a PPP Note with Cross River Bank in the amount of $759,917, falsely promising to use the loan proceeds for the purposes listed in the note.

6

9.    In executing the scheme, Defendant used the majority of the loan to pay investors in deeproot Funds, contrary to the terms of the PPP loan.

10.    On or about April 9, 2021, in the Western District of Texas and elsewhere, the Defendant,

ROBERT JEFFREY MUELLER,

did knowingly and with the intent to defraud, devise and execute a scheme to defraud Cross River Bank, the deposits of which were insured by the Federal Deposit Insurance Corporation, and to obtain from it money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing such pretenses, representations and promises were false and fraudulent when made, for the purpose of executing such scheme by submitting a PPP loan application falsely promising to use the loan proceeds on permitted business expenses under the PPP, specifically "Payroll Costs", "Rent/Mortgage Interest", and "Covered Operations Expenditures" and executing a note limiting the uses of the loan proceeds to the items listed therein.

All in violation of Title 18, United States Code, Section 1344.

## NOTICE OF UNITED STATES OF AMERICA'S DEMAND FOR FORFEITURE
### [*See* Fed.R.Crim.P. 32.2]

This Notice of Demand for Forfeiture includes but is not limited to the property below.

### I.
### Conspiracy to Commit Wire Fraud Violation and Forfeiture Statutes
**[Title 18 U.S.C. § 1343, subject to forfeiture pursuant to Title 18 U.S.C. § 981(a)(1)(C), made applicable to criminal forfeiture by Title 28 U.S.C. § 2461(c)]**

As a result of the foregoing criminal violation set forth in Counts One through Five, the United States of America gives notice to the Defendant of its intent to seek the forfeiture of certain

property upon conviction pursuant to Fed. R. Crim. P. 32.2 and to Title 18 U.S.C. 981(a)(1)(C), made applicable to criminal forfeiture by Title 28 U.S.C. § 2461(c), which states:

**Title 18 U.S.C. § 981. Civil forfeiture**

**(a)(1)** The following property is subject to forfeiture to the United States:

\* \* \*

**(C)** Any property, real or personal, which constitutes or is derived from proceeds traceable to a violation of section ... or any offense constituting "specified unlawful activity" (as defined in section 1956(c)(7) of this title), or a conspiracy to commit such offense.

Wire Fraud is an offense constituting "specified unlawful activity" as defined in Title 18 U.S.C. § 1956(c)(7).

**Title 28 U.S.C. § 2461.**

**(c)** If a person is charged in a criminal case with a violation of an Act of Congress for which the civil or criminal forfeiture of property is authorized, the Government may include notice of the forfeiture in the indictment or information pursuant to the Federal Rules of Criminal Procedure...

## II.
## Money Judgment

A sum of money which represents the amount of proceeds that constitutes or is derived from the proceeds traceable to the violation set forth above for which the Defendant is solely liable.

## III.
## Substitute Assets

If any of the property described above as being subject to forfeiture for the violations set forth above, as a result of any act or omission of Defendants:

a.    cannot be located upon the exercise of due diligence;
b.    has been transferred or sold to, or deposited with, a third party;
c.    has been placed beyond the jurisdiction of the court;
d.    has been substantially diminished in value; or
e.    has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States of America to seek forfeiture of any other property, up to the value of said money judgment, as substitute assets pursuant to Title 21 U.S.C. § 853(p) and Fed.

R. Crim. P. 32.2(e)(1).

A TRUE BILL.

**REDACTED**
FOREPERSON OF THE GRAND JURY

JUSTIN R. SIMMONS
UNITED STATES ATTORNEY

By:    For WILLIAM R. HARRIS
       Assistant United States Attorney

       For ALICIA LOVETT McNAB
       Assistant United States Attorney

9